# FISCHER v. UNITED STATES

No. 99–116.   Argued February 22, 2000—Decided May 15, 2000

668

KENNEDY, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and STEVENS, O'CONNOR, SOUTER, GINSBURG, and BREYER, JJ., joined. THOMAS, J., filed a dissenting opinion, in which SCALIA, J., joined, *post*, p. 682.

*Mark L. Horwitz* argued the cause for petitioner. With him on the briefs were *Glen J. Ioffredo, Jeffrey T. Green,* and *Kristin G. Koehler.*

*Lisa Schiavo Blatt* argued the cause for the United States. With her on the brief were *Solicitor General Waxman, Assistant Attorney General Robinson,* and *Deputy Solicitor General Dreeben.*\*

JUSTICE KENNEDY delivered the opinion of the Court.

The federal bribery statute prohibits defrauding organizations which "receiv[e], in any one year period, benefits in excess of $10,000 under a Federal program." 18 U. S. C. § 666(b). We granted certiorari to determine whether the statute covers fraud perpetrated on organizations participating in the Medicare program. Upon consideration of the role and regulated status of hospitals as health care providers under the Medicare program, we hold they receive "benefits" within the meaning of the statute. We affirm petitioner's convictions.

I

Petitioner Jeffrey Allan Fischer was president and partial owner of Quality Medical Consultants, Inc. (QMC), a corpora-

---

\**Lisa Kemler* filed a brief for the National Association of Criminal Defense Lawyers as *amicus curiae* urging reversal.

. tion which performed billing audits for health care organizations. In 1993 petitioner, on QMC's behalf, negotiated a $1.2 million loan from West Volusia Hospital Authority (WVHA), a municipal agency responsible for operating two hospitals located in West Volusia County, Florida. Both hospitals participate in the Medicare program, and in 1993 WVHA received between $10 and $15 million in Medicare funds.

A February 1994 audit of WVHA's financial affairs raised questions about the QMC loan. An investigation revealed QMC used the loan proceeds to repay creditors and to raise the salaries of its five owner-employees, including petitioner. It was determined that petitioner had arranged for QMC to advance at least $100,000 to a private company owned by an individual who had assisted QMC in securing a letter of credit in connection with the WVHA loan. QMC, at petitioner's directive, also committed portions of the loan proceeds to speculative securities. These investments yielded losses of almost $400,000. The investigation further uncovered use of the loan proceeds to pay, through an intermediate transfer, a $10,000 kickback to WVHA's chief financial officer, the individual with whom petitioner had negotiated the loan in the first instance. QMC defaulted on its obligation to WVHA and filed for bankruptcy.

In 1996 petitioner was indicted by a federal grand jury on 13 counts, including charges of defrauding an organization which receives benefits under a federal assistance program, 18 U. S. C. § 666(a)(1)(A), and of paying a kickback to one of its agents, § 666(a)(2). A jury convicted petitioner on all counts charged, and the District Court sentenced him to 65 months' imprisonment and a 3-year term of supervised release. Petitioner, in addition, was ordered to pay $1.2 million in restitution.

On appeal petitioner argued that the Government failed to prove WVHA, as the organization affected by his wrongdoing, received "benefits in excess of $10,000 under a Federal program," as required by 18 U. S. C. § 666(b). Rejecting the

argument, the United States Court of Appeals for the Eleventh Circuit affirmed the convictions. 168 F. 3d 1273 (1999). It held that funds received by an organization constitute "benefits" within the meaning of § 666(b) if the source of the funds is a federal program, like Medicare, which provides aid or assistance to participating organizations. *Id.*, at 1276–1277. Entities receiving federal funding under ordinary commercial contracts, the court stated, fall outside the statute's coverage. *Ibid.* (citing and discussing *United States* v. *Copeland*, 143 F. 3d 1439 (CA11 1998) (holding that federal funds received under a contract to construct military aircraft did not constitute "benefits" within the meaning of § 666(b))). The court added that its construction furthered "the statute's purpose of protecting from fraud, theft, and undue influence by bribery the money distributed to health care providers, and WVHA in particular, through the federal Medicare program and other similar federal assistance programs." 168 F. 3d, at 1277. It rejected the view that the Medicare program provides benefits only to its "targeted recipients," the qualifying patients. *Id.*, at 1278 (disagreeing with *United States* v. *LaHue*, 998 F. Supp. 1182 (Kan. 1998), aff'd, 170 F. 3d 1026 (CA10 1999)).

We granted certiorari, 528 U. S. 962 (1999), and we affirm.

## II

### A

The nature and purposes of the Medicare program give us essential instruction in resolving the present controversy. Established in 1965 as part of the Social Security Act, 42 U. S. C. § 1395 *et seq.* (1994 ed. and Supp. III), Medicare is a federally funded medical insurance program for the elderly and disabled. In fiscal 1997 some 38.8 million individuals were enrolled in the program, and over 6,100 hospitals were authorized to provide services to them. U. S. Dept. of Health and Human Services, Health Care Financing Administration, 1998 Data Compendium 45, 75 (Aug. 1998). Medi-

care expenditures for hospital services exceeded $123 billion in 1998, making the Federal Government the single largest source of funds for participating hospitals. See Cowen et al., National Health Expenditures, 1998, 21 Health Care Financing Review 165, 208 (Winter 1999) (Table 11). This amount constituted 32% of the hospitals' total receipts. *Ibid.*

Providers of health care services, such as the two hospitals operated by WVHA, qualify to participate in the program upon satisfying a comprehensive series of statutory and regulatory requirements, including particular accreditation standards. Hospitals, for instance, must satisfy licensing standards, 42 CFR § 482.11 (1999); possess a governing body to "ensure that there is an effective, hospital-wide quality assurance program to evaluate the provision of patient care," § 482.21; and employ a "well organized" medical staff accountable on matters relating to "the quality of the medical care provided to patients," § 482.22(b). Medicare's implementing regulations also require hospitals, among many other standards, to maintain and provide 24-hour nursing services, § 482.23; complete medical record services, § 482.24; "pharmaceutical services that meet the needs of the patients," § 482.25; and organized dietary services staffed with qualified personnel, § 482.28. The regulations go further, requiring hospital facilities to "be constructed, arranged, and maintained to ensure the safety of the patient, and to provide facilities for diagnosis and treatment and for special hospital services appropriate to the needs of the community." § 482.41. Compliance with these standards provides the Government with assurance that participating providers possess the capacity to fulfill their statutory obligation of providing "medically necessary" services "of a quality which meets professionally recognized standards of health care." 42 U. S. C. § 1320c–5(a). Peer review organizations monitor providers' compliance with these and other obligations. § 1320c–3(a); 42 CFR § 466.71 (1999). Sanctions for non-

compliance include dismissal from the program. 42 U. S. C. § 1320c–5(b)(1).

Medicare attains its objectives through an elaborate funding structure. Participating health care organizations, in exchange for rendering services, receive federal funds on a periodic basis. §§ 1395g, 1395*l*. The amounts received reflect the "reasonable cost" of services rendered, defined as "the costs necessary in the efficient delivery of needed health services to individuals covered [by the program]." § 1395x(v)(1)(A). Necessary costs are not limited to the immediate costs of an individual treatment procedure. Instead they are defined in broader terms: "Necessary and proper costs are costs that are appropriate and helpful in developing and maintaining the operation of patient care facilities and activities." 42 CFR § 413.9(b)(2) (1999). Allowable costs include amounts which enhance the organization's capacity to provide ongoing, quality services not only to eligible patients but also to the community at large. By way of example, amounts incurred for "certain educational programs for interns and residents, known as [graduate medical education] programs, are 'allowable cost[s]' for which a hospital (a provider) may receive reimbursement." *Regions Hospital* v. *Shalala*, 522 U. S. 448, 452 (1998) (citing 42 CFR § 413.85(a) (1996)); see also § 413.85(b) (1999); *Thomas Jefferson Univ.* v. *Shalala*, 512 U. S. 504, 507–508 (1994) (describing regulation of education programs). "These programs," the Medicare regulations explain, "contribute to the quality of patient care within an institution and are necessary to meet the community's needs for medical and paramedical personnel. . . . [M]any communities have not assumed responsibility for financing these programs and it is necessary that support be provided by those purchasing healthcare. Until communities undertake to bear these costs, the program will participate appropriately in the support of these activities." 42 CFR § 413.85(c) (1999). Medicare also permits, indeed encourages, these providers to deposit the amounts of reim-

bursements received for depreciation costs and other cash into sinking funds called "funded depreciation accounts." § 413.134(e). Investment income earned on these funds does not operate to reduce a provider's interest expense, § 413.153(b)(2)(iii), creating incentives to maintain modern medical equipment and facilities.

The Medicare regulations, furthermore, afford certain provider organizations "special treatment," intended to ensure the ongoing availability of medical services for qualifying patients. See 42 CFR pt. 412G (1999). Providers qualifying as "Medicare-dependent, small rural hospital[s]," for instance, are entitled to additional, "lump sum" payments to compensate for significant declines in demand for patient care. § 412.108. The additional funds enable a provider to "maintai[n] [its] necessary core staff and services" and to satisfy its "fixed (and semi-fixed) costs." §§ 412.108(d)(3)(A), (B). So too does the Medicare program authorize "special treatment" for, among other providers, "sole community hospitals," "renal transplantation centers," and "hospitals that serve a disproportionate share of low-income patients." See §§ 412.92, 412.100, 412.106. The subsidies assist providers in satisfying those financial obligations necessary to continue as going concerns in accordance with the program's requirements. See, e. g., § 412.92(d)(2).

In the normal course Medicare disbursements occur on a periodic basis, often in advance of a provider's rendering services, 42 U. S. C. § 1395g(a); 42 CFR §§ 413.60, 413.64 (1999). The payment system serves to "protect providers' liquidity," *Good Samaritan Hospital* v. *Shalala,* 508 U. S. 402, 406 (1993), thereby assisting in the ongoing provision of services. 42 CFR § 413.5(b)(1) (1999) (requiring reimbursement method to "result in current payment so that institutions will not be disadvantaged, as they sometimes are under other arrangements, by having to put up money for the purchase of goods and services well before they receive reimbursement"); § 413.5(b)(6) (reimbursement system must oper-

ate under "recognition of the need of hospitals and other providers to keep pace with growing needs and to make improvements"). The program, then, establishes correlating and reinforcing incentives: The Government has an interest in making available a high level of quality of care for the elderly and disabled; and providers, because of their financial dependence upon the program, have incentives to achieve program goals. The nature of the program bears on the question of statutory coverage.

## B

Section 666 of Title 18 of the United States Code prohibits acts of theft and fraud against organizations receiving funds under federal assistance programs. The statute in relevant part provides as follows:

"(a) Whoever, if the circumstance described in subsection (b) of this section exists—

"(1) being an agent of an organization, or of a State, local, or Indian tribal government, or any agency thereof—

"(A) embezzles, steals, obtains by fraud, or otherwise without authority knowingly converts to the use of any person other than the rightful owner or intentionally misapplies, property that—

"(i) is valued at $5,000 or more, and

"(ii) is owned by, or is under the care, custody, or control of such organization, government, or agency; or

"(B) corruptly solicits or demands for the benefit of any person, or accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more; or

"(2) corruptly gives, offers, or agrees to give anything of value to any person, with intent to influence or re-

ward an agent of an organization or of a State, local or Indian tribal government, or any agency thereof, in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more;

"shall be fined under this title, imprisoned not more than 10 years, or both.

"(b) The circumstance referred to in subsection (a) of this section is that the organization, government, or agency receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance.

"(c) This section does not apply to bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business."

Liability for the acts prohibited by subsection (a) is predicated upon a showing that the defrauded organization "receive[d], in any one period, benefits in excess of $10,000 under a Federal program." § 666(b). Those benefits can be in the form of "a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance." Ibid. All agree Medicare is a federal assistance program, see 42 CFR § 400.200 (1999), and that WVHA, as the organization defrauded by petitioner's actions, received in excess of $10,000 in payments under the program. The sole point in contention is whether those payments constituted "benefits" within the meaning of subsection (b).

Petitioner argues that the Medicare program provides benefits to the elderly and disabled but not to the health care organizations. Provider organizations, in petitioner's view, do no more than render services in exchange for compensation. Under petitioner's submission the Medicare program envisions a single beneficiary, the qualifying patient. The Government, in opposition, urges that a determination

whether an organization receives "benefits" within the meaning of § 666(b) turns on whether the Federal Government was the source of the payment. Funds received under a federal assistance program, the Government asserts, can be traced from federal coffers, often through an intermediary or carrier, to the health care provider. Under its view, the "federal-program source of the funds" satisfies the benefits definition. Brief for United States 11.

We reject petitioner's reading of the statute but without endorsing the Government's broader position. We conclude Medicare payments are "benefits," as the term is used in its ordinary sense and as it is intended in the statute. The noun "benefit" means "something that guards, aids, or promotes well-being: advantage, good"; "useful aid"; "payment, gift [such as] financial help in time of sickness, old age, or unemployment"; or "a cash payment or service provided for under an annuity, pension plan, or insurance policy." Webster's Third New International Dictionary 204 (1971). These definitions support petitioner's assertion that qualifying patients receive benefits under the Medicare program. It is commonplace for individuals to refer to their retirement or health plans as "benefits." So it ought not to be disputed that the elderly and disabled rank as the primary beneficiaries of the Medicare program. See 42 U. S. C. §§ 1395c, 1395j; 42 CFR § 400.202 (1999) (defining "beneficiary" as the "person who is entitled to Medicare benefits"); *Shalala* v. *Guernsey Memorial Hospital,* 514 U. S. 87, 91 (1995) ("Under the Medicare reimbursement scheme . . . participating hospitals furnish services to program beneficiaries and are reimbursed by the Secretary through fiscal intermediaries"); *Good Samaritan Hospital,* 508 U. S., at 404 (same).

That one beneficiary of an assistance program can be identified does not foreclose the existence of others, however. In this respect petitioner's construction would give incomplete meaning to the term "benefits." Medicare operates with a purpose and design above and beyond point-of-sale patient

care, and it follows that the benefits of the program extend in a broader manner as well. The argument limiting the term "benefits" to the program's targeted or primary beneficiaries would exclude, for example, a Medicare intermediary (such as Blue Cross and Blue Shield), a result both parties disavow. For present purposes it cannot be disputed the providers themselves derive significant advantage by satisfying the participation standards imposed by the Government. These advantages constitute benefits within the meaning of the federal bribery statute, a statute we have described as "expansive," "both as to the [conduct] forbidden and the entities covered." *Salinas* v. *United States*, 522 U. S. 52, 56 (1997).

Subsection (b) identifies several sources as providing benefits under a federal program—"a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance." 18 U. S. C. § 666(b). This language indicates that Congress viewed many federal assistance programs as providing benefits to participating organizations. Coupled with the broad substantive prohibitions of subsection (a), the language of subsection (b) reveals Congress' expansive, unambiguous intent to ensure the integrity of organizations participating in federal assistance programs.

Subsection (c) of the statute bears on the analysis. The provision removes from the statute's coverage any "bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business." § 666(c). Petitioner argues that the subsection operates to exclude the payments in question because they are either "compensation" or "expenses paid or reimbursed," or some combination of the two, and that the payments are made in the "usual course of business." We disagree.

The subsection provides that the specified sorts of payments are not ones to which the section applies. One inference from this formulation is that the described payments would have been benefits but for the subsection (c) exemp-

tion. We need not go so far. Even assuming the examples of subsection (c) bear upon the definition of benefits, statutory examples of nonapplicability do not necessarily give rise to the inference that absent the enumeration the statute would otherwise apply. To define all subsection (c) payments as exempted benefits would go well beyond the ordinary meaning of the word. On the other hand, the statute is not written to say: "The term 'benefits' does not include bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business." We must construe the term "benefits," then, in a manner consistent with Congress' intent not to reach the enumerated class of transactions. See S. Rep. No. 98–225, p. 370 (1984) ("[N]ot every Federal contract or disbursement of funds would be covered [under § 666]. For example, if a government agency lawfully purchases more than $10,000 in equipment from a supplier, it is not the intent of this section to make a theft of $5,000 or more from the supplier a Federal crime").

We do not accept the view that the Medicare payments here in question are for the limited purposes of compensating providers or reimbursing them for ordinary course expenditures. The payments are made for significant and substantial reasons in addition to compensation or reimbursement, so that neither these terms nor the usual course of business conditions set forth in subsection (c) are met here. The payments in question have attributes and purposes well beyond those described in subsection (c). These attributes and purposes are consistent with the definition of "benefit." While the payments might have similarities to payments an insurer would remit to a hospital quite without regard to the Medicare program, the Government does not make the payment unless the hospital complies with its intricate regulatory scheme. The payments are made not simply to reimburse for treatment of qualifying patients but to assist the hospital in making available and maintaining a certain level and qual-

ity of medical care, all in the interest of both the hospital and the greater community.

Here, as we have explained, the provider itself is the object of substantial Government regulation. Medicare is designed to the end that the Government receives not only reciprocal value from isolated transactions but also long-term advantages from the existence of a sound and effective health care system for the elderly and disabled. The Government enacted specific statutes and regulations to secure its own interests in promoting the well being and advantage of the health care provider, in addition to the patient who receives care. The health care provider is receiving a benefit in the conventional sense of the term, unlike the case of a contractor whom the Government does not regulate or assist for long-term objectives or for significant purposes beyond performance of an immediate transaction. Adequate payment and assistance to the health care provider is itself one of the objectives of the program. These purposes and effects suffice to make the payment a benefit within the meaning of the statute.

The structure and operation of the Medicare program reveal a comprehensive federal assistance enterprise aimed at ensuring the availability of quality health care for the broader community. Participating health care organizations, as our above discussion shows, must satisfy a series of qualification and accreditation requirements, standards aimed in part at ensuring the provision of a certain quality of care. See 42 CFR pt. 482 (1999). By reimbursing participating providers for a wide range of costs and expenses, including medical treatment costs, overhead costs, and education costs, Medicare's reimbursement system furthers this objective. This scheme is structured to ensure that providers possess the capacity to render, on an ongoing basis, medical care to the program's qualifying patients. The structure, moreover, proves untenable petitioner's assertion that Congress has no interest in the financial stability of pro-

viders once services are rendered to patients. Payments are made in a manner calculated to maintain provider stability. §413.5(b); *Good Samaritan Hospital*, 508 U. S., at 406. Incentives are given for long-term improvements, such as capital costs and education. §§413.85, 413.134(e), 413.153(b)(2)(iii). Subsidies, defined as "special treatment," are awarded to certain providers. *Id.*, pt. 412G. In short, provider organizations play a vital role and maintain a high level of responsibility in carrying out the program's purposes. Medicare funds, in turn, provide benefits extending beyond isolated, point-of-sale treatment transactions. The funds health care organizations receive for participating in the Medicare program constitute "benefits" within the meaning of 18 U. S. C. §666(b).

Our discussion should not be taken to suggest that federal funds disbursed under an assistance program will result in coverage of all recipient fraud under §666(b). Any receipt of federal funds can, at some level of generality, be characterized as a benefit. The statute does not employ this broad, almost limitless use of the term. Doing so would turn almost every act of fraud or bribery into a federal offense, upsetting the proper federal balance. To determine whether an organization participating in a federal assistance program receives "benefits," an examination must be undertaken of the program's structure, operation, and purpose. The inquiry should examine the conditions under which the organization receives the federal payments. The answer could depend, as it does here, on whether the recipient's own operations are one of the reasons for maintaining the program. Health care organizations participating in the Medicare program satisfy this standard.

The Government has a legitimate and significant interest in prohibiting financial fraud or acts of bribery being perpetrated upon Medicare providers. Fraudulent acts threaten the program's integrity. They raise the risk participating organizations will lack the resources requisite to provide the

level and quality of care envisioned by the program. Cf. *Salinas*, 522 U. S., at 61 (stating that acceptance of bribes by an official of a jail housing federal prisoners pursuant to an agreement with the Government "was a threat to the integrity and proper operation of the federal program").

Other cases may present questions requiring further examination and elaboration of the term "benefits." Here it suffices to hold that health care providers such as the one defrauded by petitioner receive benefits within the meaning of the statute. The judgment of the Court of Appeals is affirmed.

*It is so ordered.*

JUSTICE THOMAS, with whom JUSTICE SCALIA joins, dissenting.

In my view, the only persons who receive "benefits" under Medicare are the individual elderly and disabled Medicare patients, not the medical providers who serve them. Payments made by the Federal Government to a Medicare health care provider to reimburse the provider for the costs of services rendered, rather than to provide financial aid to the hospital, are not "benefits." I respectfully dissent.

## I

The jurisdictional provision of 18 U. S. C. §666(b) requires that an "organization, government, or agency receiv[e], in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance." As the Court notes, an organization is not a beneficiary of a federal program merely because the organization receives federal funds. *Ante*, at 677, 681. Rather, as the Court admits, a "benefit" is something that "guards, aids, or promotes well-being"; "useful aid"; or a "payment, gift [as] financial help in time of sickness, old age, or unemployment." Webster's Third New International Dictionary 204 (1971).

Therefore, the Court acknowledges, an organization "receives . . . benefits" within the meaning of §666(b) only if the federal funds are designed to guard, aid, or promote the well-being of the organization, to provide useful aid to the organization, or to give the organization financial help in time of trouble. In my view, payments made by the Federal Government to a Medicare health care provider as part of a market transaction are not "benefits."[1]

The statutory and regulatory scheme governing Medicare reimbursements leaves no doubt that hospitals do not receive "benefits" from the Federal Government within this meaning of the term, but merely receive payments for costs pursuant to a market transaction. Although the Medicare reimbursement scheme is quite complex, it suffices to point out a few critical components.[2]

Under the "reasonable cost" reimbursement provisions relied on by the Court, *ante*, at 673–675, the Federal Government reimburses providers for "the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health serv-

---

[1] Even if I thought that, under a reading of §666(b) standing alone, a market exchange of payment for services might amount to "benefits," §666(c) would eliminate that doubt. Section 666(c) makes clear that "bona fide . . . expenses paid or reimbursed, in the usual course of business," are not covered by the statute. As discussed below, Medicare payments to health care providers are precisely this type of payment.

[2] In 1993, the year relevant to the instant case, Medicare consisted of two separate programs, Parts A and B. Part A provides insurance for certain elderly or disabled persons to cover the costs of inpatient hospital care, nursing facility care, home health services, and hospice care. See generally 42 U. S. C. §§1395c to 1395i–4. Part B is a voluntary program that provides supplemental benefits to elderly or disabled Medicare participants to cover the costs of, among other things, physician services, laboratory and diagnostic tests, ambulance services, and prescription drugs. See generally §§1395j to 1395w–4. The Government did not present evidence at petitioner's trial regarding which provisions of Medicare accounted for the payments made to the West Volusia Hospital Authority in 1993.

ices." 42 U. S. C. § 1395x(v)(1)(A). The Social Security Act that created Medicare instructed the Secretary of Health and Human Services to promulgate regulations establishing the methods of determining "reasonable costs" and specifically directed the Secretary to consider, among other things, reimbursement methods used by private insurers. *Ibid.* See also *Shalala* v. *Guernsey Memorial Hospital,* 514 U. S. 87, 91–92 (1995).

Under these regulations, the Federal Government reimburses medical providers based upon the lower of the provider's reasonable cost of furnishing these services to beneficiaries or the provider's customary charges for the services. 42 CFR § 413.1(b) (1999). The regulations are designed to provide reimbursement for the actual cost of providing care to elderly and disabled Medicare beneficiaries. See § 413.5(a) ("Thus, the application of this approach, with appropriate accounting support, will result in meeting actual costs of services to beneficiaries"). The regulations make clear that the Federal Government will reimburse hospitals only for the costs of providing medical care to Medicare patients, as opposed to nonbeneficiary patients. § 413.80(d) ("Under Medicare . . . costs of services provided for other than beneficiaries are not to be borne by the Medicare program"); § 413.9(a) ("All payments to providers of services must be based on the reasonable cost of services covered under Medicare and related to the care of beneficiaries"); § 413.9(c)(3) ("The determination of reasonable cost of services must be based on cost related to the care of Medicare beneficiaries").

Although these reimbursement provisions permit hospitals to recover capital costs, such as the cost of maintaining building facilities, § 413.9(c), the allowable reimbursement for these expenditures is only the amount reasonably attributable to Medicare patients as opposed to general maintenance of the facilities. See § 413.9(b) ("The objective is that under the methods of determining costs, the costs with respect to

individuals covered by the program will not be borne by individuals not so covered, and the costs with respect to individuals not so covered will not be borne by the program").

The "prospective payment system" adopted by Congress in 1983 to increase efficiency and reduce costs operates somewhat differently from the "reasonable cost" provisions but is also designed to reimburse hospitals for the cost of providing care to Medicare beneficiaries. 42 U. S. C. § 1395ww; 42 CFR pt. 412 (1999). Under this system, the Medicare program pays hospitals a fixed price for each case based on the patient's diagnosis related grouping (DRG), which is assigned based on the patient's diagnosis, age, and sex, among other things. 42 U. S. C. § 1395ww(e); 24 CFR § 412.60 (1999). The DRG figure represents the average cost of treating patients within the DRG. 42 U. S. C. § 1395ww(d)(2); 49 Fed. Reg. 251 (1984). Significantly, because hospitals are paid fixed amounts based on the DRG, the hospital, like any other private contractor, bears the risk of higher costs. See Kinney, Making Hard Choices under the Medicare Prospective Payment System: One Administrative Model for Allocating Medical Resources under a Government Health Insurance Program, 19 Ind. L. Rev. 1151, 1151–1152 (1986).

Thus, the statute and regulations make clear that medical providers are entitled only to reimbursement for the actual or estimated cost of services rendered to Medicare patients and that individual elderly and disabled patients—not hospitals—are the beneficiaries of the Medicare program. Indeed, the Social Security Act explicitly says so. See 42 U. S. C. § 1395a(b)(5) (1994 ed., Supp. III) ("The term 'medicare beneficiary' means an *individual* who is entitled to benefits" (emphasis added)). The Act repeatedly refers to Medicare "benefits" as assistance provided to individual participants, rather than to medical providers. See, *e. g.,* § 1395a ("Any individual entitled to insurance benefits under this subchapter"); § 1395b–2 ("Such notice shall be mailed an-

nually to individuals entitled to benefits under part A or part B of this subchapter and when an individual applies for benefits under part A of this subchapter or enrolls under part B of this subchapter"); § 1395b–4(a) ("health insurance coverage to individuals who are eligible to receive benefits under this subchapter"); § 1395b–4(b)(2)(A)(i) ("information that may assist individuals in obtaining benefits"). In contrast, the Act commonly refers to "payments" to providers of medical services. See, e. g., § 1395g(a) ("no such payments shall be made to any provider unless it has furnished such information as the Secretary may request"); § 1395f(a) ("payment for services furnished an individual may be made only to providers of services"); § 1395n(a) (1994 ed. and Supp. III) ("payment for services . . . furnished an individual may be made only to providers of services which are eligible"). This terminology, and the Medicare regulations defining allowable costs, reflect the fact that Medicare is a program for providing "financial help" to individual elderly and disabled patients rather than to the health care providers who treat them. Medicare's provisions for reimbursing providers' costs do nothing more than establish a market exchange of payment for services, and so cannot be said to provide "benefits" within the meaning of 18 U. S. C. § 666(b).

## II

Although the statutory provisions and regulations cited above demonstrate that Medicare operates as a reimbursement scheme with respect to health care providers, and not as a means of providing them "useful aid" or "financial help," the Court finds in the statute and regulations evidence that health care providers are, along with the individual elderly and disabled patients, also target beneficiaries of the program. I think that the Court's reasoning is both unpersuasive and boundless; any funds flowing from a federal assistance program could be deemed "benefits" under the Court's rationale, notwithstanding the Court's concluding disclaimer

of such a result. Thus, although the Court purports to reject the Government's argument that "benefits" means "funds that originate in a federal assistance program," the Court, in practice, adopts it.

## A

First, the Court describes Medicare's elaborate funding structure and notes that Medicare's reasonable cost recovery system allows recovery of certain capital costs and the costs of education and training. *Ante*, at 673–674. These provisions of Medicare do not establish that hospitals receive "benefits." To the contrary, the capital costs recoverable under those provisions of Medicare are the costs tied to the treatment of Medicare patients. See *supra*, at 684–685. In this sense, the cost provisions of Medicare expressly defeat any suggestion that they are meant to provide a "benefit" to the hospital. These provisions are not designed to provide financial assistance to the hospital; they are designed to ensure that Medicare beneficiaries receive quality medical care. And again, the Medicare program picks up only the portion of the costs attributable to the care of Medicare beneficiaries. 42 CFR §§ 413.50, 413.85 (1999). In fact, the Court does not grapple with the evidence that Medicare systematically *under*-compensates health care providers, evidence that would further undermine the notion that hospitals are receiving some form of financial assistance from the program. See Utz, Federalism in Health Care: Costs and Benefits, 28 Conn. L. Rev. 127, 138–139 (1995).

Second, the Court relies on the numerous obligations imposed on health care providers participating in Medicare. *Ante*, at 672–675. The Court notes that health care providers must satisfy licensing standards, provide a laundry list of particular health care services, and ensure an effective quality-assurance program. I assume, however, that the same could be said of most Government contractors. The defense contractor who agrees to build the military's equip-

ment is, no doubt, subject to an extensive list of statutory and regulatory requirements, not because the Government intends to provide "benefits" to the contractor, but because the Federal Government intends to place controls on the expenditure of federal dollars. See *United States* v. *Copeland,* 143 F. 3d 1439, 1442 (CA11 1998) (discussing regulatory burdens on defense contractors). Similarly, private insurers no doubt impose various requirements on those who receive reimbursements from them. In requiring hospitals to meet certain standards, the Federal Government is no different from these private insurers, except that the Federal Government exercises vastly greater market power. In other words, the imposition on health care providers of an intricate regulatory scheme is irrelevant to the question whether funds paid pursuant to that scheme are benefits.

Third, the Court contends that some health care providers receive "special treatment" in the form of lump sum payments designed to ensure the providers' ability to satisfy financial obligations. *Ante,* at 674. This feature of Medicare is also insufficient to show that any "benefits" were received by West Volusia Hospital Authority. These payments, which are part of the prospective payment system, see *supra,* at 685, are based on estimated costs of providing services to Medicare beneficiaries. See, *e. g.,* 42 CFR § 412.108 (1999). Like the standard reimbursement schemes outlined above, this payment system does not subsidize the hospital, it pays the hospital prospectively for performing a service.

Finally, the Court concludes, based on its observations of Medicare, that "Medicare operates with a purpose and design above and beyond point-of-sale patient care," namely, "ensuring the availability of quality health care for the broader community." *Ante,* at 677, 680. According to the Court, Medicare guarantees that "providers possess the capacity to render, on an ongoing basis, medical care to the program's qualifying patients." *Ante,* at 680. In other words, Medicare exists to guarantee patients' access to quality medical

care. Quality medical care is available only if medical providers remain financially viable. Medicare payments create demand for medical services and, therefore, provide "benefits" to health care providers. This syllogism, however, amounts to nothing more than the self-evident point that Medicare aims to ensure that the beneficiaries of the program—patients—are able to receive the program's intended benefits. It does not establish that Medicare exists to put hospitals on the dole.

In short, none of the components of Medicare cited by the Court establishes that benefits flow to hospitals. It is significant that, although the Court repeatedly invokes, mantra-like, its conclusion that Medicare exists for a purpose above and beyond reimbursing hospitals for treating Medicare patients, see, e. g., *ante*, at 677–678, 679, 680, 681, when the Court comes around to actually identifying this purpose, it can only state: "The structure and operation of the Medicare program reveal a comprehensive federal assistance enterprise aimed at ensuring the availability of quality health care for the broader community." *Ante*, at 680. The Court cannot bring itself to say, as it must, that Medicare exists for the *hospital*.[3]

---

[3] And even if I were to accept that some provisions of Medicare—the special treatment provisions, for example—provide a benefit to health care providers, there is no evidence in the record that West Volusia Hospital Authority received any such payments. Without such evidence, the Court's reliance on special provisions to uphold petitioner's conviction is improper. Title 18 U. S. C. § 666(b) is, after all, a jurisdictional provision that allows federal prosecution only if the specific organization at issue received more than $10,000 in "benefits." The Court treats the provision as window dressing. It is not necessary, under the Court's view, to show that *this* organization received benefits. It is sufficient to show that some hospitals receive them.

This approach is particularly inappropriate because § 666(b), or some similar jurisdictional provision, is constitutionally required. Section 666 was adopted pursuant to Congress' spending power, Art. I, § 8, cl. 1. We have held that the spending power requires, at least, that the exercise of federal power be related "to the federal interest in particular national

B

Although the Court disclaims the Government's argument that "benefits" means only funds provided under a federal assistance program, the Court, in practice, adopts it. The Court's expansive rationale could be applied to any federal assistance program that provides funds to any organization. This result is inconsistent with the plain meaning of the statute. If Congress had meant to apply § 666 to any organization that receives "funds" totaling more than $10,000 per annum, it would have said so. Cf. 18 U. S. C. § 665 ("Whoever, being . . . connected in any capacity with any agency or organization receiving financial assistance or any funds under [a certain federal program] knowingly enrolls an ineligible participant, embezzles, willfully misapplies, steals, or obtains by fraud any of the moneys, funds, assets, or property which are the subject of a financial assistance agreement or contract pursuant to such Act shall be [punished]"). Congress, for that matter, could have omitted the word "benefits" from the statute and provided simply that any organization that "receives, in any one year period, in excess of $10,000 under a Federal program involving a . . . form of federal assistance" is covered by the statute. That Congress did not do so suggests that the word "benefits" has a

projects or programs." *South Dakota* v. *Dole,* 483 U. S. 203, 207 (1987) (internal quotation marks omitted). See *id.,* at 213 (O'CONNOR, J., dissenting). Arguably, if Congress attempted to criminalize acts of theft or bribery based solely on the fact that—in circumstances unrelated to the theft or bribery—the victim organization received federal funds as payment for a market transaction, this constitutional requirement would not be satisfied. Without a jurisdictional provision that would ensure that in *each* case the exercise of federal power is related to the federal interest in a federal program, § 666 would criminalize routine acts of fraud or bribery, which, as the Court admits, would "upse[t] the proper federal balance." *Ante,* at 681. Cf. *United States* v. *Lopez,* 514 U. S. 549, 561 (1995) ("[Section] 922(q) contains no jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce").

meaning separate and apart from the words "under a Federal program involving a . . . form of federal assistance." I am doubtful that the Court's interpretation gives any meaning at all to the word "benefits" in § 666(b) because, under the Court's rationale, any organization that receives $10,000 under a federal program involving federal assistance receives "benefits" in such an amount.

This expansive construction of § 666(b) is, at the very least, inconsistent with the rule of lenity—which the Court does not discuss. This principle requires that, to the extent that there is any ambiguity in the term "benefits," we should resolve that ambiguity in favor of the defendant. See *United States* v. *Bass*, 404 U. S. 336, 347 (1971) ("In various ways over the years, we have stated that when choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite" (internal quotation marks omitted)).

## C

I doubt that there is any federal assistance program that does not provide "benefits" to organizations under the Court's expansive rationale, but will illustrate my point with just one example employed by two lower courts. See *United States* v. *Wyncoop*, 11 F. 3d 119, 123 (CA9 1993); *United States* v. *LaHue*, 998 F. Supp. 1182, 1187 (Kan. 1998), aff'd, 170 F. 3d 1026 (CA10 1999). Many grocery stores accept more than $10,000 per annum in food stamps distributed to individual beneficiaries as part of the Federal Food Stamp and Food Distribution Program. Like Medicare providers, stores participating in the Food Stamp Program are required to satisfy a comprehensive series of statutory and regulatory requirements. See 7 CFR pt. 278 (1999). For example, stores are qualified to participate only if they sell an adequate percentage of staple foods such as meat, cereal, and dairy products. § 278.1(b)(1). Stores must document an

ability to attract food stamp business and demonstrate the business integrity and reputation of the store owners and managers. §§ 278.1(b)(2)–(3). Like Medicare, the Food Stamp Program monitors the providers' compliance with the program's requirements. See § 278.1(n). Like Medicare, the Food Stamp Program sanctions noncompliance with dismissal from the program. § 278.1(l). And, the Food Stamp Program is like Medicare in that it can be described as having "a purpose and design above and beyond point-of-sale" of food. *Ante,* at 677. Undoubtedly, the Food Stamp Program helps to address the "grocery gap," that is, the lack of availability of reasonably priced nutritional foods in some low-income and rural areas. See Note, Food Stamp Trafficking: Why Small Groceries Need Judicial Protection from the Department of Agriculture (And from Their Own Employees), 96 Mich. L. Rev. 2156, 2176–2177 (1998); Department of Agriculture, Office of Analysis & Evaluation, Food Retailers in the Food Stamp Program: Characteristics and Service to Program Participants 15 (Feb. 1997) (Table 6). There is ample evidence on the face of the statute and regulations that Congress and the agency had in mind the need to ensure that low-income communities have access to grocery stores. See 7 U. S. C. § 2021(a) (1994 ed., Supp. IV) (requiring the Secretary to consider hardship to the community in making disqualification determinations); 7 CFR § 278.1(b)(1)(ii)(C) (1999) (listing availability of food stores in the community as a factor relevant to a firm's application to participate in the program). It could be said, therefore, that the grocery store's "own operations are one of the reasons for maintaining the program." *Ante,* at 681.

To my mind, the reason that a corner grocery does not receive "benefits" is simply that it merely receives payment from the Government in a market transaction. I fail to see, however, how the Court could reach the same conclusion that I would. Although the Court assures us that its holding today is narrow and factbound, depending on the "structure,

operation, and purpose" of Medicare, *ibid.*, the consequences of the Court's reasoning are far reaching. In fact, the Court candidly acknowledges that its interpretation is expansive when it reads 18 U. S. C. § 666(b) to suggest that "Congress viewed *many* federal assistance programs as providing benefits to participating organizations." *Ante*, at 678 (emphasis added). In contrast, I think that the plain language of § 666(b) reflects a congressional intent to reach only those organizations that are *themselves* the beneficiaries of "useful aid" or "financial help in time of sickness, old age, or unemployment," rather than organizations that merely receive funds as part of a market transaction for goods or services.

\*     \*     \*

For the foregoing reasons, I respectfully dissent.