FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

JUDITH ANN PAIXAO,
*Defendant-Appellant.*

No. 16-50121

D.C. No.
3:13-cr-03788-JM-1

OPINION

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

KEVIN A. LOMBARD,
*Defendant-Appellant.*

No. 16-50122

D.C. No.
3:13-cr-03788-JM-2

Appeals from the United States District Court
for the Southern District of California
Jeffrey T. Miller, Senior District Judge, Presiding

Argued and Submitted February 7, 2018
Pasadena, California

Filed March 22, 2018

Before:  Susan P. Graber and Andrew D. Hurwitz, Circuit
Judges, and Edward R. Korman,[*] District Judge.

Opinion by Judge Graber

**SUMMARY**[**]

**Criminal Law**

The panel affirmed two defendants' convictions for
violating 18 U.S.C. § 666, which prohibits the wrongful
taking of property from an organization that receives more
than $10,000 in federal "benefits" during a one-year period.

The charges arose from the defendants' misuse of funds
belonging to the Wounded Marine Careers Foundation
(WMCF), a non-profit foundation they founded that was
dedicated to teaching interested veterans the technical skills
required to succeed in the film industry.  The defendants
obtained funding from a Department of Veterans Affairs
program, the Vocational Rehabilitation and Employment
(VRE) Program, which provides, on behalf of specific
veterans, payments to the educational institutions that those
veterans attend; and the VA certified WMCF as a vendor
authorized to provide training.

---

[*] The Honorable Edward R. Korman, United States District Judge for
the Eastern District of New York, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has
been prepared by court staff for the convenience of the reader.

The panel held that there was sufficient evidence from which the jury could reasonably conclude that the Foundation received "benefits" within the meaning of § 666(b). The panel explained that an entity need not be the primary beneficiary of a federal program to qualify as having received "benefits," and that the VRE Program aims to aid veterans *and* to ensure the viability and quality of the organizations that serve those veterans. The panel wrote that the requirements imposed upon institutions participating in the VRE Program further suggest that those institutions receive "benefits."

**COUNSEL**

Devin Burstein (argued), Warren & Burstein, San Diego, California; James A. Alexander, Radiant, Virginia; for Defendants-Appellants.

Helen H. Hong (argued), Assistant United States Attorney, United States Attorney's Office, San Diego, California, for Plaintiff-Appellee.

**OPINION**

GRABER, Circuit Judge:

Defendants Judith Paixao and Kevin Lombard were charged with crimes relating to their misuse of funds belonging to the Wounded Marine Careers Foundation ("WMCF"). The jury convicted them of, among other things, violating 18 U.S.C. § 666, a statute prohibiting the wrongful taking of property from an organization that receives more than $10,000 in federal "benefits" during a one-year period.

In this opinion, we address only one issue: whether WMCF received "benefits" within the meaning of 18 U.S.C. § 666(b).[1] For the reasons that follow, we hold that there was sufficient evidence from which the jury could reasonably conclude that WMCF did, indeed, receive "benefits" within the meaning of the statute and therefore affirm.

FACTUAL AND PROCEDURAL HISTORY

The following facts were established at trial. In 2007, Defendants founded WMCF, a non-profit foundation dedicated to teaching interested veterans the technical skills required to succeed in the film industry. After encountering fund-raising trouble, Defendants sought funding from a Department of Veteran Affairs ("VA") program, the Vocational Rehabilitation and Employment Program ("VRE Program"). The VRE Program provides, on behalf of specific

---

[1] In a separate memorandum disposition, filed this date, we address all other issues relevant to this appeal and affirm with respect to those issues.

veterans, payments to the educational institutions that those veterans attend.

For WMCF to receive payments, the VA had to approve its training program. Further, WMCF had to comply with a number of federal regulations. *See* 38 C.F.R. §§ 21.120–21.162. As part of the approval process, WMCF submitted to the VA a curriculum, education contract, and budget. In December 2007, the VA approved the application and certified WMCF as a vendor authorized to provide training to wounded veterans.

Defendants recruited veterans eligible for the VRE Program. To authorize funding, the VA required each veteran to submit an "individualized written rehabilitation plan." Defendants ultimately submitted rehabilitation plans on behalf of eight of the veterans in WMCF's inaugural class. Defendants submitted invoices to the VA for those veterans' costs, and the VA, in turn, approved the invoices. The VA also provided Defendants with accelerated payments "to help the foundation." Without VA funding, WMCF was not financially viable.

Defendants repeatedly asked WMCF's board to pay them salaries and to reimburse their personal expenses. The board, however, refused to approve salaries for Defendants and declined to pay their living expenses, medical expenses, or pensions—at least until WMCF was financially solvent. Nevertheless, Defendants transferred significant sums from WMCF's account to their personal accounts. Defendants also spent large sums of WMCF's money on personal expenses such as groceries, meals, medical bills, and coffee.

The government charged Defendants with, among other crimes not relevant here, wrongfully taking WMCF funds in violation of 18 U.S.C. § 666 (Counts 2–9). The jury found Defendants guilty on all § 666 counts. The district court sentenced Paixao to six months in custody and Lombard to three months in custody, and ordered both to pay restitution. Defendants timely appealed.

## DISCUSSION

Title 18 U.S.C. § 666 prohibits the wrongful taking of property from certain federally funded organizations. Liability under § 666 is conditioned upon a showing that the defrauded organization "receive[d] in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance." 18 U.S.C. § 666(b). Defendants argue that the government failed to present sufficient evidence that WMCF received "benefits" within the meaning of the statute. We disagree.

A. *Legal and Statutory Background*

The key case concerning § 666(b) is *Fischer v. United States*, 529 U.S. 667 (2000). *Fischer* held that healthcare organizations participating in the Medicare program received "benefits" within the meaning of § 666(b). *Id.* at 678.

The Court began by noting that § 666(b) contemplates a variety of kinds of "benefits"—such as grants, contracts, subsidies, loans, guarantees, and even insurance. *Id.* at 676–77. The Court also observed that Congress enacted the statute with an "expansive, unambiguous intent to ensure the integrity of organizations participating in federal assistance

programs." *Id.* at 678; *see also* S. Rep. No. 98-225, at 370 (1984), *as reprinted in* 1984 U.S.C.C.A.N. 3182, 3511 (noting that the "Committee intends that the term 'Federal program involving a grant, a contract, a subsidy, a loan, a guarantee, insurance, or another form of federal assistance' be construed broadly"). The Court reasoned, then, that "Congress viewed *many* federal assistance programs as providing benefits [under § 666(b)]." *Fischer*, 529 U.S. at 678 (emphasis added).

But, the Court explained, not all federal funds qualify as "benefits." *Id.* at 671. For example, the statute expressly excepts any "bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business." 18 U.S.C. § 666(c). Accordingly, funds obtained through "ordinary commercial contracts"—for instance, when a government agency buys equipment from a supplier—fall beyond the statute's reach. *Fischer*, 529 U.S. at 671.

Because not all payments under federal programs qualify as "benefits," the Court adopted a context-specific test that requires an examination of the federal program's "structure, operation, and purpose." *Id.* at 681. The Court further instructed us to "examine the conditions under which the organization receives the federal payments." *Id.* Notably, the inquiry turns on the attributes of the federal program, not on the characteristics of the recipient organization.

*Fischer* teaches that § 666 embodies a distinction between transactions that occur "in the usual course of business" and those that do not. There is, we think, a fundamental difference between the role that the government plays when it routinely makes the purchases required to maintain things

like federal lands or buildings and the role that the
government plays when it embarks on an enterprise meant to
aid a particular segment of the public. The inquiry is a tricky
one, though, because what may be a "beneficial" act in one
context—granting every soup kitchen in the nation funds to
purchase new ovens—may be mere maintenance in
another—granting federal courthouses' cafeterias funds to
replace their ovens.

But even when the government acts as a benefactor, it
necessarily must make the everyday purchases required to
keep that enterprise afloat. And in those situations, it is not
always clear whether the government has disbursed
"benefits." To return to the given examples, it is not
immediately clear whether the ovens' manufacturer (rather
than the soup kitchen or the federal courthouses) would have
received "benefits" under the statute. The answer to *that*
question would depend, among other things, on the program's
purpose, organization, and structure—that is, whether the
government meant to aid the manufacturer by establishing the
program; whether the manufacturer had to comply with
certain rules and regulations to participate in the program;
and the degree to which the program required the
manufacturer to work hand-in-hand with the government.
Those principles, applied here, demonstrate that WMCF
received "benefits" within the meaning of § 666(b).

B. *The VRE Program's Purpose*

In establishing the VRE Program, Congress aimed "to
provide for all services and assistance necessary to enable
veterans with service-connected disabilities to achieve
maximum independence in daily living and, to the maximum
extent feasible, to become employable and to obtain and

maintain suitable employment." 38 U.S.C. § 3100. The statutory text reveals that the VRE Program exists primarily to benefit veterans—just as Medicare exists primarily to benefit patients, *Fischer*, 529 U.S. at 677–78. But an entity need not be the *primary* beneficiary of a federal program to qualify as having received "benefits." *Id.* at 677; *see also United States v. Zyskind*, 118 F.3d 113, 116 (2d Cir. 1997) ("Nothing in the language of § 666 suggests that its reach is limited to organizations that were the direct beneficiaries of federal funds."). Indeed, a federal program may have, as a secondary purpose, the goal of establishing a "sound and effective . . . system" for distributing benefits to their ultimate recipients. *Fischer*, 529 U.S. at 680. That is, federal payments may promote the dual purposes of reimbursing an institution for its services while, at the same time, ensuring that those services remain "available . . . [at] a certain level and quality." *Id.* at 679–80.

The government acted with such dual purposes here. The VRE program exists not just to assist veterans but also "to provide *for all services and assistance* necessary to [assist] veterans." 38 U.S.C. § 3100 (emphasis added). With that end in mind, Congress instructed the Secretary to "actively promote *the development and establishment* of employment, training, and other related opportunities for. . . veterans." *Id.* § 3116(a) (emphasis added). That broad *programmatic* interest suggests that, in this instance, the government acted as more than a buyer in the normal course of business. Rather, the government established a program meant to encourage the creation and development of institutions aimed at providing services to veterans.

Of course, we do not think that Congress created the VRE Program to benefit WMCF specifically. Indeed, it is likely

that Congress enacted the program without any particular educational institution in mind. But the program, as Congress described it, aims to aid veterans *and* to ensure the viability and quality of the organizations that serve those veterans. And that programmatic interest suggests that WMCF received "benefits" under *Fischer*.

## C. *The VRE Program's Requirements*

The requirements imposed upon institutions participating in the VRE Program further suggest that those institutions receive "benefits." Much like providers receiving Medicare funds, institutions receiving VRE funding are "the object of substantial Government regulation." *Fischer*, 529 U.S. at 680. For an institution to receive VRE payments, its facilities must have "space, equipment, instructional material and instructor personnel adequate in kind, quality, and amount to provide the desired service for the veteran." 38 C.F.R. § 21.294(a)(1). The institution's courses must "[m]eet the customary requirements in the locality for employment in the occupation in which training is given" and "[m]eet the requirements for licensure or permit to practice the occupation, if such is required." *Id.* § 21.294(a)(3). Moreover, the institution must agree to "cooperate" with the VA and to "provide timely and accurate information covering the veteran's attendance, performance, and progress in training in the manner prescribed by VA." *Id.* § 21.294(a)(4)(i)–(ii). After certification, the institution must regularly report "information on enrollment, entrance, reentrance, change in the hours of credit or attendance, pursuit, interruption and termination of attendance of each veteran." *Id.* § 21.4203(a)(1). Further, as the facts of this case demonstrate, the VA requires that participating institutions submit catalogs describing their programs and

costs and that VA officials visit participating institutions to monitor their suitability for the program.

That level of government involvement distinguishes institutions like WMCF from the contractors that the government engages in its usual course of business. The regulations require institutions receiving VRE Program funds to maintain a certain level of quality. Although that fact alone does little to set those institutions apart from other government contractors, the VRE Program requires more than a special level of quality from its participants. To participate in the program, institutions must engage in an ongoing back-and-forth with the federal government. That arm-in-arm approach shows that the government's interest in those institutions differs in kind from its interest in standard contractors.

Defendants insist that the aforementioned standards and regulations are "not particularly rigorous." But the facts of this case suggest otherwise. Not even a year after WMCF began receiving payments, the VA reviewed WMCF's eligibility for funds, found issues with approval standards, and suspended WMCF's approval. The VA re-approved WMCF's funding only after WMCF acknowledged and corrected a litany of problems that the VA identified. That degree of oversight further suggests that the funds at issue were "benefits" and not ordinary payments.

D. *The VRE Program's Structure and Operation*

Finally, Defendants argue that the VRE Program differs significantly from Medicare in its payment structure and that this case is thus distinguishable from *Fischer*. Specifically, Defendants emphasize that the VA reimburses WMCF for

*only the veteran's direct costs* (tuition, fees, and equipment), whereas Medicare reimburses providers for a wider range of costs, including some overhead and training-related costs.

*Fischer*, however, does not suggest that an institution *must* receive reimbursement for institutional costs to qualify as receiving "benefits." First, the payments at issue in *Fischer* reflected the reasonable cost of services rendered. 529 U.S. at 673. And second, as explained above, the Court looked *beyond* Medicare's reimbursement program to consider the government's purpose in making payments and the conditions under which healthcare providers received those payments. Thus, even accepting that the VRE Program is structured so differently from Medicare as to render *Fischer* distinguishable on this point, *Fischer*'s other factors compel us to conclude that WMCF received "benefits" within the meaning of § 666(b).

Defendants' reliance on *United States v. Wyncoop*, 11 F.3d 119 (9th Cir. 1993), is unavailing. In *Wyncoop*, we held that Trend College had not received § 666(b) "benefits" simply by participating in federal student loan programs. *Id.* at 123. Our decision in *Wyncoop* turned almost entirely on the fact that Trend College *itself* never received or administered federal funds. *Id.* But the VRE Program works differently. As this case demonstrates, institutions participating in the VRE Program receive government funds *directly* (and subsequently use them to aid veterans).[2]

---

[2] In *Wyncoop*, we observed that "there is no . . . reason to conclude that Congress in enacting section 666 intended to bring employees at every college and university in the country within the scope of potential federal criminal jurisdiction." 11 F.3d at 123. But we made that observation before the Supreme Court decided *Fischer*. *Fischer* makes

Because WMCF received "benefits" within the meaning of § 666(b), Defendants' convictions are **AFFIRMED.**

---

clear that the "benefits" question turns on the purposes and the operation of the specific federal program at issue.  Under *Fischer*, we conclude that the funds at issue here were "benefits."  To the extent that *Wyncoop* can be understood to contradict the Supreme Court's later holding, it no longer is binding.  *See Miller v. Gammie*, 335 F.3d 889, 893 (9th Cir. 2003) (en banc) (noting that, when one of our prior decisions is "clearly irreconcilable with the reasoning or theory of intervening higher authority," we should consider ourselves "bound by the later and controlling authority, and should reject the prior . . . opinion as having been effectively overruled").