[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-10061
_____

D.C. Docket No. 0:13-cr-60068-JIC-1

UNITED STATES OF AMERICA,

Plaintiff–Appellant–Cross-Appellee,

versus

DAVID MCLEAN

Defendant–Appellee–Cross-Appellant.

_____

Appeals from the United States District Court
for the Southern District of Florida
_____

(September 24, 2015)

Before MARCUS and WILSON, Circuit Judges, and SCHLESINGER,[*] District
Judge.

_____

[*] Honorable Harvey E. Schlesinger, United States District Judge for the Middle District of
Florida, sitting by designation.

SCHLESINGER, District Judge:

This appeal presents us with two challenges.  First, we must address the limits of a federal criminal statute to ensure the statute comports with the Constitution and that it does not invade the domain of the States' police power.

No federal criminal common law exists.  This proposition was "long since settled" not twenty-five years following the ratification of the United States Constitution.  *United States v. Hudson*, 11 U.S. (7 Cranch) 32 (1812).  Congress— not the courts—crafts federal crimes by delineating the elements and prescribing punishment.  *See United States v. Wiltberger*, 18 U.S. (5 Wheat.) 76, 95 (1820) (noting "[T]he power of punishment is vested in the legislative, not in the judicial department.  It is the legislature, not the Court, which is to define a crime, and ordain its punishment."); *Liparota v. United States*, 471 U.S. 419, 424 (1985) (explaining federal crimes are "solely creatures of statute").

Over recent generations the federal criminal code has burgeoned, leading some writers to characterize the trend as the federalization of crime.  *See* Susan A. Ehrlich, *The Increasing Federalization of Crime*, 32 Ariz. St. L.J. 825 (2000); Edwin Meese, III, *Big Brother on the Beat:  The Expanding Federalization of Crime*, 1 Tex. Rev. L. & Pol. 1 (1997).  Despite Congress' increasing role in regulating criminal activity, States traditionally have "undertake[n] criminal prosecutions" springing from their "power and authority originally belonging to

2

them before admission to the Union and preserved to them by the Tenth Amendment," *Heath v. Alabama*, 474 U.S. 82, 89 (1985)—such is the internal tension of our federalist system.  While both sovereigns have the authority to regulate criminal conduct within their spheres of influence, each sovereign must guard against encroachment upon the other's authority.

The Constitution provides that limitation on Congress.  Congress must find permission to create federal criminal laws in the Constitution.  *Sabri v. United States*, 541 U.S. 600 (2004); *United States v. Edgar*, 304 F.3d 1320 (11th Cir. 2002).  This case involves the claimed use of federal monies and the mishandling thereof as the constitutional basis for federal criminal regulation.

To protect against the infringement on the inherent powers of the states by federalizing traditional state offenses, the government is required to prove beyond a reasonable doubt each element of a criminal offense, *United States v. Gaudin*, 515 U.S. 506 (1995), and the failure to do so is fatal to the case.  In addition to other purposes, this burden safeguards the accused's constitutional rights, ensures the government does not overreach by prosecuting actions that do not comport with the statutory language, and guarantees that federal crimes remain distinct from state crimes.

In this case, we must scrutinize the evidence to ensure that the government is not prosecuting an act of state bribery.  To be convicted of the federal crime of

3

bribery in programs receiving federal funds, Congress has prescribed that the government must prove beyond a reasonable doubt that a corrupt defendant worked for a state entity "which receive[d] (1) more than $10,000 in federal funds [and] (2) in connection with programs defined by a sufficiently comprehensive 'structure, operation, and purpose' to merit characterization of the funds as benefits under § 666(b)." *Edgar*, 304 F.3d at 1327.

In addition to our federalism concerns, we are mindful that the Supreme Court recently cautioned against federal criminal statutes being read too expansively. *See, e.g., Yates v. United States*, 135 S. Ct. 1074 (2015) (concluding the term "tangible object" defined within the Sarbanes-Oxley Act of 2002, legislation designed to restore confidence in financial markets, did not apply to the undersized red grouper that a commercial fishing vessel's captain threw overboard).

Second, we are called upon to determine if the government presented sufficient evidence to prove each of the elements of the charged offenses. Importantly, we are not called upon to pass judgment on the character of David McLean. We are, however, reminded of the words of John Adams, a Founding Father and second President, who once wrote, "But if Virtue was to be rewarded with Wealth it would not be Virtue. If Virtue was to be rewarded with Fame, it would not be Virtue of the sublimest Kind." Letter from John Adams to Abigail

Adams, (Dec. 2 1778), available at http://www.masshist.org/digitaladams /archive/popup?id=L17781202ja&page=L17781202ja_3.

The phrase "public service for private gain" encapsulated the government's case so well that it began opening statements and closing argument with variations of it.  Ad hominem attacks, irrespective of how effective they may be, cannot obfuscate the requirement that the government must prove its case beyond a reasonable doubt.  While this Court, and even John Adams, might have concurred with the government's characterization of McLean, in order to obtain a conviction the government must present evidence as to each element of an offense—and that is precisely what it failed to do here.

## I.  INTRODUCTION

On August 15, 2013, David McLean was charged in a superseding indictment with three counts of bribery in programs receiving federal funds, in violation of 18 U.S.C. § 666(a)(1)(B) and (2).  Count One charged McLean with accepting $1,000 in U.S. currency and a release for $8,000 past due rent in connection with the awarding of a Margate occupational license.  Count Two alleged that "on or about November 2, 2012," McLean,

> being an agent of Margate, to wit, a City Commissioner of Margate, Florida, did knowingly and corruptly solicit, demand, accept and agree to accept anything of value from a person, that is, approximately $3,000 in United States currency, intending to be influenced and rewarded in connection with a transaction and series of transactions of

5

Margate involving $5,000 or more, that is, a $25,000 MCRA construction grant.

All in violation of Title 18, United States Code, Sections 666(a)(l)(B) and 2.

In Count Three, the Government alleged that "on or about January 30, 2013," McLean,

being an agent of Margate, to wit, a City Commissioner of Margate, Florida, did knowingly and corruptly solicit, demand, accept and agree to accept anything of value from a person, that is, approximately $2,000 in United States currency, intending to be influenced and rewarded in connection with a transaction and series of transactions of Margate involving $5,000 or more, that is, a $25,000 MCRA construction grant.

All in violation of Title 18, United States Code, Sections 666(a)(l)(B) and 2.

Following a jury trial, McLean was acquitted on Count One and convicted on Counts Two and Three.

At the conclusion of the trial, McLean renewed his Motion for Judgment of Acquittal and filed a Motion for New Trial. Twenty-one days later, beyond the fourteen-day deadline, the government responded. McLean moved to strike the government's untimely response and sought an Order granting McLean's motion by default.

The District Court, on December 5, 2013, denied the Motions to Strike and for a New Trial, but granted McLean's Renewed Motion for Judgment of Acquittal. The District Court concluded that while the government introduced

6

adequate evidence that the Margate Community Redevelopment Agency ("MCRA") received benefits from a federal program, the government failed to establish that those benefits were received within the timeframe established in the superseding indictment.

## II. FACTS

McLean served as a Commissioner for the City of Margate, Florida ("City"), between 2004 and 2013. Each City Commissioner simultaneously served on the board of the MCRA. The MCRA is a component of the City with a purpose to promote the physical and economic development of the City. Relevant here, MCRA's principal activity is to award matching grants to property owners who improve their properties by construction, landscaping, or other design projects.

In addition to serving as a Commissioner, McLean was the proprietor of "Dave's Tiki Bar." The bar was located in a building in a shopping center owned by the government's cooperating witness, Lutchman "Chris" Singh. In addition to owning the shopping center, Singh owned an automobile alarm and stereo installation business in the center.

Once McLean rented the building from Singh around July 2011, he stopped paying Singh the rent he owed for the bar. Singh was afraid to initiate eviction proceedings against McLean, because he worried McLean would use his influence or position to make things difficult for Singh's business. In November 2011, Singh

7

took his concerns to the FBI. The FBI instructed Singh to begin recording his conversations with McLean, and Singh began doing so in early 2012.

In January 2012, in exchange for a reduction in past-due rent, McLean agreed to "help[] make the process smoother" for Singh to obtain an auto repair license from the City. The license costs $125, but Singh explained that, in his view, having the license added between $60,000 and $100,000 of value to his business. Singh paid McLean $1,000 in cash and agreed to forgive $8,000 in back rent in exchange for this assistance.

McLean and Singh also discussed the possibility of filing a fraudulent application for a matching grant from the MCRA. Essentially, they planned to file an inflated application for construction costs to improve Singh's shopping center, find a contractor who could complete the work for much less, and split the difference between the MCRA grant and the actual construction costs. To this end, McLean and Singh prepared an inflated application, which they submitted to the MCRA for approval on October 31, 2012. The MCRA voted on the application the next day and approved it; McLean abstained from the vote purportedly because Singh was his landlord.

On November 2, 2012, Singh met with McLean, gave McLean $3,000 in cash, and reminded McLean that he still owed McLean $2,000. On January 30, 2013, Singh met with McLean and gave him the remaining $2,000. Immediately

8

after this meeting, FBI agents approached McLean. McLean accompanied the agents to the FBI's office and consented to an interview, during which he stated, "I know I shouldn't have taken the money. I know the guy was setting me up. He kept wanting to have this meeting and I knew I shouldn't have done it." McLean claimed Singh had given him the money for acting as a consultant on the grant application process and helping him with the paperwork.

### III. STANDARDS OF REVIEW

We review the grant of a motion for judgment of acquittal de novo, giving no deference to the district court's determination that the evidence was insufficient to support the jury's verdict. *United States v. Vernon*, 723 F.3d 1234, 1252 (11th Cir. 2013). In conducting this review, we consider the evidence in the light most favorable to the government, accepting all reasonable inferences and credibility determinations made by the jury. *Id.* The government need not rebut all reasonable hypotheses other than guilt, and the jury may choose among the conclusions to be drawn from the evidence at trial. *Id.* A judgment of acquittal is warranted only when no reasonable jury could have found the defendant guilty beyond a reasonable doubt. *United States v. Almanzar*, 634 F.3d 1214, 1221 (11th Cir. 2011).

A district court's determination that the evidence against a defendant was insufficient to support the jury's guilty verdict is a conclusion of law to which we

accord no deference. *United States v. Molina*, 443 F.3d 824, 828 (11th Cir. 2006). "We must conduct an independent review to decide whether the jury verdicts rest on substantial evidence, taking the view most favorable to the government." *United States v. Macko*, 994 F.2d 1526, 1532 (11th Cir. 1993) (citation and internal quotation marks omitted). The test is "whether a reasonable jury could have found the defendant guilty beyond a reasonable doubt." *United States v. Sellers*, 871 F.2d 1019, 1021 (11th Cir. 1989). "If the evidence fairly supports a verdict of guilty, such that a reasonable jury could find the defendant guilty beyond a reasonable doubt, then the jury's verdict may not be overturned." *Id.* at 1021-22.

We review a district court's application of its local rules for an abuse of discretion. *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1302 (11th Cir. 2009). The district court's interpretation of its own rules is entitled to great deference, and the challenging party bears the burden of showing that the district court made a clear error of judgment. *Id.* A district court abuses its discretion when it applies an incorrect legal standard, "applies the law in an unreasonable or incorrect manner, follows improper procedures in making a determination, or makes findings of fact that are clearly erroneous." *Citizens for Police Accountability Political Comm. v. Browning*, 572 F.3d 1213, 1216-17 (11th Cir. 2009).

10

## IV. ISSUES PRESENTED

The government argues that the district court erred in granting McLean's post-verdict Motion for Judgment of Acquittal because the court failed to consider relevant evidence and to draw inferences in favor of the jury's verdict. The government asserts that, viewing the evidence in the light most favorable to the government, the United States sufficiently established that the MCRA received federal benefits in excess of $10,000.

McLean cross-appeals the district court's Order denying his Motion to Strike the government's untimely response to his Renewed Motion for Judgment of Acquittal and Motion for a New Trial. McLean argues the District Court should have granted his motions by default judgment because the government violated the district court's local rules when it filed its response one week late. McLean asserts that he would not have been treated the same had he filed his Fed. R. Crim. P. 29 motion late, and he contends that he was prejudiced by having to respond to the government's untimely arguments.

## V. DISCUSSION

### A. Sufficient Connection to Federal Funds

Section 666(a) of Title 18 of the United States Code criminalizes, in pertinent part, the corrupt solicitation or acceptance of "any thing of value of $5,000 or more" by an agent of a local government or agency thereof with the

11

intent "to be influenced or rewarded in connection with any business, transaction, or series of transactions" of such agency. 18 U.S.C. § 666(a)(l)(B). The statute requires that the government or agency in question have "receive[d], in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance." *Id.* § 666(b). The phrase "in any one-year period" is defined as "a continuous period that commences no earlier than twelve months before the commission of the offense or that ends no later than twelve months after the commission of the offense." *Id.* § 666(d)(5).[1]

---

[1] The statute provides in full:

> (a) Whoever, if the circumstance described in subsection (b) of this section exists–
>> (1) being an agent of an organization, or of a State, local, or Indian tribal government, or any agency thereof–
>>> (A) embezzles, steals, obtains by fraud, or otherwise without authority knowingly converts to the use of any person other than the rightful owner or intentionally misapplies, property that–
>>>> (i) is valued at $5,000 or more, and
>>>> (ii) is owned by, or is under the care, custody, or control of such organization, government, or agency; or
>>> (B) corruptly solicits or demands for the benefit of any person, or accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization, government, or agency involving any thing of value of $5,000 or more; or
>> (2) corruptly gives, offers, or agrees to give anything of value to any person, with intent to influence or reward an agent of an organization or of a State, local or Indian tribal government, or any agency thereof, in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more;

12

The Supreme Court has addressed the scope of § 666 on at least three occasions.  In *Salinas v. United States*, 522 U.S. 52, 57 (1997), the Court held that the government need not show the bribe the defendant received affected the federal funds.  Salinas had argued that one of the elements of a § 666 offense was that the bribe impacted the federal funds.  *Id*. at 55-57.  This interpretation of the statute

---

shall be fined under this title, imprisoned not more than 10 years, or both.

(b) The circumstance referred to in subsection (a) of this section is that the organization, government, or agency receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance.

(c) This section does not apply to bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business.

(d) As used in this section–

    (1) the term "agent" means a person authorized to act on behalf of another person or a government and, in the case of an organization or government, includes a servant or employee, and a partner, director, officer, manager, and representative;

    (2) the term "government agency" means a subdivision of the executive, legislative, judicial, or other branch of government, including a department, independent establishment, commission, administration, authority, board, and bureau, and a corporation or other legal entity established, and subject to control, by a government or governments for the execution of a governmental or intergovernmental program;

    (3) the term "local" means of or pertaining to a political subdivision within a State;

    (4) the term "State" includes a State of the United States, the District of Columbia, and any commonwealth, territory, or possession of the United States; and

    (5) the term "in any one-year period" means a continuous period that commences no earlier than twelve months before the commission of the offense or that ends no later than twelve months after the commission of the offense. Such period may include time both before and after the commission of the offense.

18 U.S.C. § 666.

was soundly rejected by the Court based on § 666's "expansive, unqualified language, both as to the bribes forbidden and the entities covered, [and] does not support the interpretation that federal funds must be affected to violate" § 666. *Id.* at 56-57.    Importantly, *Salinas* declined to address whether § 666 required "some other kind of connection between a bribe and the expenditure of federal funds," thereby leaving the door open for such a requirement. *Id.* at 59.

Later in *Fischer v. United States*, 529 U.S. 667 (2000), the Supreme Court clarified that even when the defendant's agency was not the primary intended beneficiary of the federal funds, the jurisdictional element of the offense may still be met.  Fischer had been convicted for defrauding the West Virginia Health Authority, a participant in the federal Medicare program, and the Supreme Court had to decide whether the Medicare funds constituted benefits under § 666. *Id*. at 677-81.  The *Fischer* Court held that Medicare benefits constituted federal benefits conferred on a hospital, even though the payments represented "the 'reasonable cost' of services rendered" for patients, who were the primary beneficiaries. *Id.* at 673.

The *Fischer* Court emphasized that the Medicare statute "operates with a purpose and design above and beyond point-of-sale patient care, and it follows that the benefits of the program extend in a broader manner as well." *Id.* at 677-78. Indeed, hospitals "play a vital role and maintain a high level of responsibility in

14

carrying out the program's purposes." *Id.* at 681. Thus, because advantages to hospitals were within the contemplation of the Medicare statute, the payments constituted federal benefits within the meaning of the criminal statute. *Id.* at 678. The Court also pointed out that "the Government does not make the payment unless the hospital complies with its intricate regulatory scheme" and that the hospitals receive value not just "from isolated transactions but also long-term advantages from the existence of a sound and effective health care system." *Id.* at 679-80. These attributes served to distinguish a hospital from "a contractor whom the Government does not regulate or assist for long-term objectives or for significant purposes beyond performance of an immediate transaction." *Id.* at 680.

The Supreme Court cautioned that § 666 should not be read without boundaries, for failure to do so "would turn almost every act of fraud or bribery into a federal offense, upsetting the proper federal balance." *Id.* at 681. In analyzing whether the payments were benefits, the Court explained, "To determine whether an organization participating in a federal assistance program receives 'benefits,' an examination must be undertaken of the program's structure, operation, and purpose." *Id.* To satisfy this scrutiny, a court "should examine the conditions under which the organization receives the federal payments. The answer could depend, as it does here, on whether the recipient's own operations are one of the reasons for maintaining the program." *Id.* Ultimately, the *Fischer* Court

15

determined the Medicare funds were a benefit since "[t]he payments are made not simply to reimburse for treatment of qualifying patients but to assist the hospital in making available and maintaining a certain level and quality of medical care, all in the interest of both the hospital and the greater community." *Id.* at 679-80.

The *Fischer* decision makes clear, that under some circumstances, indirect receipt of a benefit is sufficient. The question that *Fischer* leaves open is how closely the scheme authorizing the disbursement of federal funds and their ultimate use at the agency must share a common purpose. *See id.* at 681 (noting that whether an agency has received a federal benefit "could depend . . . on whether the recipient's own operations are one of the reasons for maintaining the program").

More recently, in *Sabri v. United States*, 541 U.S. 600, 606 (2004), the Court held that the government was not required to prove a nexus between the defendant's criminal activity and the federal funds. In particular, *Sabri* explained that Congress' authority under the Spending Clause, art. I, § 8, cl. 1, and the Necessary and Proper Clause, art. I, § 8, cl. 18, enabled it to ensure that "taxpayer dollars" were "not frittered away in graft or on projects undermined when funds are siphoned off or corrupt public officers are derelict about demanding value for dollars." *Id.* at 605. Simply put, Congress did "not have to sit by and accept the risk of operations thwarted by local and state improbity. Section 666(a)(2) addresses the problem at the sources of bribes, by rational means, to safeguard the

16

integrity of the state, local, and tribal recipients of federal dollars." *Id.* (internal citation omitted).

Following *Salinas* and *Fischer*, this Court considered whether § 666 was a facially unconstitutional exercise of congressional power under the Spending Clause. *Edgar*, 304 F.3d 1320. We recognized that the Supreme Court had "rejected the government's contention that *any* funds distributed from federal coffers would qualify as benefits for purposes of the limitation established by § 666(b)." *Id.* at 1324. In our view, *Fischer* held that "the evaluation of whether particular federal receipts count as 'benefits' turns on the relevant federal 'program's structure, operation, and purpose,' as well as the conditions under which an entity receives federal payments." *Id.*

In *Edgar*, this Court emphasized that post-*Fischer*, "it is clear that the term 'benefits' encompasses only federal funds expended under sufficiently comprehensive programs," explaining that the inquiry into the factors enumerated by the Supreme Court "presages a broad enough inquiry to assure that applications of § 666 remain within constitutional bounds." *Id.* at 1325. The *Edgar* decision further held that in order to sustain a conviction under the statute the government must prove beyond a reasonable doubt that the individual worked for an "entit[y] which receive[d] (1) more than $10,000 in federal funds (2) in connection with programs defined by a sufficiently comprehensive 'structure, operation, and

17

purpose' to merit characterization of the funds as benefits under § 666(b)." *Id.* at 1327. [2]

Two of our sister circuits have determined that the government need not prove the defendant's agency received money directly from the federal government but only that there was a sufficient nexus between the federal funds and their ultimate use to satisfy the receipt element of § 666. For example, the Second Circuit considered the issue in *United States v. Zyskind*, 118 F.3d 113 (2d Cir. 1997). In *Zyskind*, the defendant was "the administrator of Hi-Li Manor Home for Adults ("Hi-Li"), a facility licensed by the New York State Department of Social Services to provide care for adults who were handicapped or mentally impaired." *Id.* at 114. "Hi-Li was not a direct beneficiary of a federal funding program. However, at the time of the events in question, nearly all of Hi-Li's residents received federal benefits from the Social Security Administration or the Department of Veterans Affairs." *Id.* Because Hi-Li was the legal custodian of some of its residents, a portion of the Veterans Affairs checks were made out directly to the home. *Id.*

---

[2] In *Edgar*, we also recognized that *Fischer* appeared to validate the Second and Third Circuits' determination, pre-*Fischer*, that § 666 could potentially encompass an "exceedingly large class of traditional state offenses" but that these Circuits recognized "an offense element limiting [§ 666]'s application to conduct bearing a sufficient connection to the expenditure of federal funds or the integrity of federal programs." *Edgar*, 304 F.3d at 1325 (citing *United States v. Zwick*, 199 F.3d 672, 682-83 (3d Cir. 1999); *United States v. Santopietro*, 166 F.3d 88, 93 (2d Cir. 1999)). The Supreme Court, in *Fischer*, confirmed the constitutional limits that these Circuits suspected existed. *Id.*

The Second Circuit held that proof the agency indirectly received benefits over $10,000 is sufficient. *Id.* at 116.  The *Zyskind* Court looked to the statutory text and concluded, "Nothing in this language suggests that § 666 does not reach thefts by an agent of an organization that receives federal program moneys and administers those moneys for the benefit of program beneficiaries;" rather, it operates to "prevent diversions of federal funds not only by agents of organizations that are direct beneficiaries of federal benefits funds, but by agents of organizations to whom such funds are disbursed for further distribution to or for the benefit of individual beneficiaries."  *Id.* (internal quotation marks and alterations omitted). The Court found that the legislative history confirmed this view because Congress intended to enact a broad prohibition on bribery.  *Id.* "The section was enacted as part of an effort to 'create new offenses to augment the ability of the United States to vindicate significant acts of theft, fraud, and bribery involving Federal monies that are *disbursed to private organizations* or State and local governments pursuant to a Federal program.'"  *Id.* (quoting S. Rep. No. 98-225, at 369 (1983), *as reprinted in* 1984 U.S.C.C.A.N. 3182, 3510).  "The purpose of the legislation was to 'protect the integrity of the vast sums of money *distributed through* Federal programs from theft, fraud, and undue influence by bribery.'" *Id.* (quoting S. Rep. No. 98-225, at 370, 1984 U.S.C.C.A.N. at 3511). Thus, the *Zyskind* Court concluded, the Veterans Affairs checks qualified as benefits to Hi-Li.

19

The First Circuit reached the same conclusion in a case where federal funds were distributed to the Commonwealth of Puerto Rico by the National Institute on Drug Abuse. *United States v. Dubón-Otero*, 292 F.3d 1, 8 (1st Cir. 2002). The funds "were originally disbursed under a grant to the Puerto Rico Department of Anti-Addiction Services. Anti-Addiction Services in turn made a grant of a portion of these funds to the Municipality, which then paid Health Services"—the agency where the defendants worked. *Id.* The *Dubón-Otero* Court held that "[i]t makes no difference that Health Services received this money indirectly," because "benefits under § 666 are not limited solely to primary target recipients or beneficiaries." *Id.* at 9. The Court emphasized the "Health Services' contract with the Municipality contemplated a relationship between Health Services and the United States Government, and those operating federal assistance programs like the Institute are well aware that recipients of program funds use subgrants and subcontracts to further effectuate the program's goals." *Id.* In other words, the federal funds were related to the agency programs to which they ultimately flowed even if the federal government did not "intend[] to aid or promote the well being" of Health Services specifically. *Id.* at 8. Moreover, even though Health Services was a subgrantee rather than a direct recipient of funds, "the requirements for each subgrantee or subcontract relationship are subject to the same requirements for accountability of federal funds and terms of the award as the actual grantee

20

recipient of federal funds." *Id.* at 10 (internal quotation marks omitted). In light of these circumstances, the First Circuit concluded that Health Services had received federal benefits under § 666. *Id.* at 10.

McLean cites the Ninth Circuit's decision in *United States v. Wyncoop*, 11 F.3d 119 (9th Cir. 1993), for the proposition that other courts require a more direct connection between the federal funds and the local agency. In *Wyncoop*, the defendant embezzled money from the college that employed him. *Id.* at 120. The college received no federal funds, but the government argued that its participation in federal student loan programming was sufficient to establish the jurisdictional element:

> Under both the Guaranteed Student Loan ("GSL") and Supplemental Loans to Students ("SLS") programs set forth in 20 U.S.C. §§ 1071-1099, private banks loan money to qualified students for educational purposes, and the federal government guarantees the loans. Thus, if a student borrower defaults on a loan obligation, the government will repay the bank. In order for its students to be eligible to receive these federally guaranteed loans, a school must agree to abide by a number of conditions, including a requirement that the school monitor the continued enrollment and eligibility of the loan recipients. For this reason banks often issue the loan checks jointly to the student and to the school.

*Id.* at 120-21. The Ninth Circuit held that the statute was not intended to sweep in indirect beneficiaries of federal funding. Looking to the legislative history, the Court noted the statute was intended to fill two specific gaps in the existing bribery legislation:

21

First, under 18 U.S.C. § 641, which proscribed the theft of property "belonging to the United States," theft of money distributed under federal programs could not be prosecuted if title to the funds had either passed to another entity or had become so commingled with other assets that the "federal character" of the funds could not be shown. Second, the existing federal bribery statute, 18 U.S.C. § 201, was inadequate to ensure the integrity of federal programs because individuals administering the funds but employed by other entities had been found not to be "[f]ederal officials" as required under that statute.

*Id.* at 122 (alteration in original). In short, the Ninth Circuit agreed with the defendant that "the statute was not intended to cover thefts from institutions like Trend College that do not themselves receive and administer federal funds." *Id.*; *accord United States v. Bynum*, 327 F.3d 986, 991 (9th Cir. 2003).

*Wyncoop* is easily distinguishable from this case—the college at issue there was a private institution and the decision was issued before *Fischer*, though the Ninth Circuit still cites it favorably. *See*, *e.g.*, *Bynum*, 327 F.3d at 991.

A better case for McLean, in some respects, is the Fifth Circuit's opinion in *United States v. Jackson*, 313 F.3d 231 (5th Cir. 2002), which McLean cites as evidence that the government must support its case with documentary evidence tracking the path of federal funds. In *Jackson*, the defendant "was director of the Department of Community Affairs (DCA) for the City of Monroe, Louisiana, which operates city golf courses, parks, the museum, civic center, and other recreational venues for the City of Monroe." *Id.* at 233. The government introduced evidence that the City had received two federal grants, one in each of

22

the relevant one-year time periods, through testimony by the Director of Administration for the City. *Id.* at 234. In the first year, the City received a $12,900 grant from the National Endowment for the Humanities ("NEH") to be used for the Louisiana Folk Life Festival, and in the second it received the same grant in the amount of $10,090. *Id.* "No grant documents in evidence substantiate[d] receipts from the NEH of those amounts," and another witness indicated the festival was entirely funded by state and local sources. *Id.* In light of this contradiction, the government changed its position and argued that other state and local agencies had received federal funding which was then passed through to the City. *Id.* at 235.

The Court assumed for purposes of its analysis that the record would support an inference that two of the state and local grants the festival received drew on federal funding from the NEH. *Id.* It based this assumption on specific record evidence establishing that (1) the NEH made grants to the Northeast Louisiana Art Council and the Louisiana Endowment for the Humanities, and (2) that each of those organizations gave grants to the City related to the Folk Life Festival. *Id.* at 234-35 & nn.9-10. It found, "The questions then become how much of the grants from local or state agencies were of federal origin, and *when* such funds were received." *Id.* at 235. The Court first found that the testimony presented at trial was insufficient to prove receipt in the relevant one-year period beyond a

23

reasonable doubt, because the witness testified as to the City's fiscal year rather than to a calendar year that aligned with the charges. Looking to the documentary evidence, the Court accepted that one check was designated as federal funds. *Id.* at 236-37. However, as to the other check, the Court concluded that even though the evidence suggested "*[s]ome* underlying federal (NEH) support for [one of the disputed grants] is apparent from the evidence," it also "suggest[ed] *multiple sources* of support." *Id.* at 237. Because the government had not proved beyond a reasonable doubt that at least $10,000 distributed to the defendant's agency originated from the NEH, the Court found that the jury could not infer the jurisdictional element of § 666. *Id.* at 238.

Although *Jackson* does not establish—as McLean suggests—that the government must demonstrate that the agency for which the defendant worked received federal dollars or require the government to prove its case by documentary evidence, it does reiterate that the government must prove each element beyond a reasonable doubt and that courts ought to scrutinize the actual evidence it presents in support of something like the jurisdictional element, which in many cases is a routine showing.

The import of the above cases is unmistakable—regardless of whether an agency receives federal funds directly or indirectly, there must be a nexus between the funds and their ultimate use to satisfy § 666. In other words, to constitutionally

24

cabin § 666 courts must evaluate a federal program's "structure, operation, and purpose" to determine if the federal receipts qualify as benefits.  Failure to conduct this necessary investigation violates *Fischer*'s admonition that § 666 is not a boundless statute that applies to virtually every state bribery or fraud case.

With this standard as our guide, we turn to the dispute before us.  The sole dispute is the "jurisdictional element" that establishes a federal question in § 666 prosecutions; that is, whether "the organization, government, or agency receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance."  18 U.S.C. § 666(b).

The government insists the evidence adduced at trial, when viewed in the light most favorable to it, showed that federal benefits in excess of $10,000 under federal programs passed from the City to the MCRA for use in redeveloping blighted and economically depressed areas of the City.  What is more, during the relevant time periods for Counts II and III, the MCRA received six bus shelters built with federal stimulus funds, which qualified as benefits under § 666(b).  A reasonable jury, therefore, could have concluded that the MCRA, of which McLean was an agent, received benefits in excess of $10,000 under a federal program involving some form of federal assistance during the one-year periods covered by Counts II and III of the superseding indictment. That evidence,

25

according to the government, was sufficient to establish the jurisdictional basis for the charges against McLean and support his convictions.  The government was not required to demonstrate, contrary to the district court's determination, that § 666(b) is restricted to funds which are directly received by the agency under the federal program.

McClean, by contrast, maintains the government failed to show that the MCRA either directly or indirectly received federal benefits that exceeded $10,000 in fiscal years 2012 to 2013.  In fact, the evidence demonstrated the exact opposite when Dennis Holste, the Assistant Director of the MCRA from 2004-2013, testified on cross-examination that the MCRA "never actually had federal dollars provided" to them.  According to McLean, at its core, the government's case was flawed and the District Court properly granted the Motion for Judgment of Acquittal.  Additionally, McLean argues that there was insufficient evidence for a jury to find beyond a reasonable doubt that the MCRA received the bus shelters.

At trial, the government introduced testimonial and documentary evidence to provide the jury a financial picture of the City and the MCRA; among the documents were government Exhibits 2, 4, 6, and 8.  Government Exhibit 2 was the City's Comprehensive Annual Financial Report ("Financial Report") for the fiscal year ending September 30, 2012.  The Financial Report described the MCRA as a component unit of the City but with a purpose to promote the physical and

26

economic redevelopment of the City.    Although the MCRA is a legally separate entity, the City was financially accountable for the MCRA and the MCRA is part of the government's operations. The City's Commission served as the MCRA's Board of Commissioners.

The Financial Report established that the City maintains thirteen individual governmental funds; the two principle funds are the City's general fund and the MCRA fund.  The City received over $8 million in federal grants during fiscal year 2012, including approximately $4 million in community development block grant ("CDBG") funds.  CDBG funds are used for landscaping of blighted areas, commercial revitalization, and park rehabilitation, among other things.[3]  In fiscal year 2012, the MCRA received revenues from:  tax incremental financing ("TIF"), a type of property tax collected by the City; investment income; charges for services; rental income; and some miscellaneous revenue.  The report specifically states that the MCRA did not directly receive any intergovernmental funds—i.e. state or federal funds—in the fiscal year ending September 30, 2012.

Of the federal funds that the City expended in fiscal year 2012, $1,791,675 were from the various grants made through the CDBG, including the Neighborhood Stabilization Program.  During fiscal year 2012, the City also

---

[3] This page of the Financial Report is not numbered. It appears immediately before page 53, and follows another unnumbered page entitled "Combining and Individual Fund Financial Statements."

received and expended other federal funds that it received from or through programs within the Departments of Agriculture, Justice, Transportation, Energy, Homeland Security, and the Executive Office of the President. The City additionally received $272,000 in hurricane relief funds from the Federal Emergency Management Agency either at the end of fiscal year 2011 or the beginning of fiscal year 2012.

According to the City's Financial Report, the City received and expended $4,515,499 in federal assistance for the 2012 fiscal year. The money came from several different agencies within the federal government, although the only funding that arguably could have filtered through the City down to the MCRA is (1) $1,241,339, which came from the Department of Housing and Urban Development in the form of four CDBGs; or (2) $13,865 from the Department of Transportation, which was allocated to the City by the Florida Department of Transportation for Highway Planning and Construction.

Government Exhibit 4 was the City's Revenue Report ("Revenue Report"), dated April 4, 2013. According to the Revenue Report, the City received over $11,000 in federal grants to its general fund for fiscal year 2013. The City had also received hundreds of thousands of dollars in federal grants to its CDBG accounts.

Government Exhibit 6 was a printout of the MCRA website's home page dated October 16, 2012. The webpage referred to the installation of new bus

28

shelters as a beautification effort that had improved the appearance of the redevelopment area.   The page stated, in relevant part: "Other beautification efforts, including . . . the installation of new bus shelters, have improved the appearance of the redevelopment area."

Government Exhibit 8 was the MCRA's proposed budget for fiscal year 2013, from October 1, 2012, to September 30, 2013.  The budget listed projected expenditures and actual expenditures from the preceding fiscal year, and provided estimates for the expected costs in the coming year.  The budget listed several sources of funding for the MCRA.  First, listed under the heading "Tax Increment Financing" were the City, Broward County, and North Broward Hospital.  Next, under the heading of "Other Revenue" were listed:  "fund balance transfer," which represents any surplus from the following year; rent receipts; and event fees.

Importantly, Exhibit 8 included $100,000.00 for "bus shelters" as a "capital outlay expenditure," and budgeted costs for the painting and maintenance of bus shelters in a section entitled "Other CRA Property."  Such an entry was absent in the previous year, from October 1, 2011 to September 30, 2012.  In addition, the budget further provided that, as of an August 2012 revision, the MCRA anticipated incurring $26,000 in bus shelter maintenance expenses.

In addition to the documentary evidence, two witnesses testified concerning the MCRA's financing.  Gail Gargano, Director of Finance for the City, explained

29

that every year the City received money from the federal government.  For fiscal year 2012, Gargano estimated that the City received $4.5 million in federal funds, whereas for fiscal year 2013 she estimated the City would receive in excess of $2 million in federal funds.  Gargano explained that the MCRA is financially dependent upon the City.  The MCRA is primarily funded by TIF, and Gargano identified the MCRA's three funding sources:  the City; Broward County; and the hospital district.

Dennis Holtse, the former Assistant Director of the MCRA, testified that he "oversaw the operations" of the MCRA from 2004 to 2013.  Holtse explained that the MCRA's mission was to eliminate slums and blight, and the MCRA attempted to accomplish this goal by awarding partial grants to eligible commercial properties for physical improvements, landscaping, and architectural design. While the MCRA staff reviewed property owners' applications and made recommendations, the Board of Commissioners voted on whether to award each grant, which essentially reimbursed half of an applicant's costs.

As for the MCRA's financial structure, Holtse testified that the MCRA was funded by tax revenue, with the largest contributor being the City, the second largest, Broward County, and the third, North Broward Hospital District.  He also said that the MCRA generated rent revenues from its ownership of two shopping centers and event space revenues from a property it owns.

The government specifically asked Holtse whether, looking at the MCRA budget for 20l2, it was apparent that the agency "receive[d] over $10,000 in funds that are funneled through from the Federal Government in the years 2011, 2012, and 2013?"  Holtse responded:

> Well, the money -- there were projects done in the [M]CRA district, in conjunction with the [M]CRA, and that was the State Road 7 landscaping project and bus shelters that were built. The State Road 7 landscaping project, [MCRA] contributed $61,000 for the project, and the rest was the State Road project -- State Road, they got federal dollars for that, and that was used to do the landscape improvements and rehabilitate the roadway. Bus shelters, that was part of the stimulus package and [MCRA] agreed to maintain the shelters once they were built. They were built in conformance with the [M]CRA shelters already built.

Holtse then explained that Broward County built six bus shelters for the MCRA to supplement the MCRA's existing shelters, representing a value of approximately $40,000 each, or $240,000 total for all six shelters.  After Broward County paid to have the shelters built, it was MCRA's responsibility to maintain them. The bus shelters, according to Holtse, were completed by Broward County in the calendar year of 2012 and federal dollars were used for their construction.  The bus shelters were built in conformance with existing MCRA shelters.

On cross examination, defense counsel asked Holtse, "I am curious, where is the federal money?"  Holtse responded, "Hum -- well, the federal money -- we never actually had federal dollars provided to us."  Defense counsel then asked

31

Holtse, "So, the United States Government, United States of America never funded any [MCRA] projects?" Holtse attempted to explain,

> Well, the money didn't come directly to us.  With the bus shelters, that was given to the county and the county built the shelters, and we agreed to maintain them. As part of the Three R Project, State Road 7, repavement of that, we contributed $615,000 TIF monies for that.  I believe there were federal monies.  I don't know.

On redirect, Holtse attempted to clarify, "Federal stimulus were used for the bus shelters.  State Road 7, I don't know their connection with the federal, state gets money from a variety of sources related to state road project." According to Holtse, the bus shelters were completed in 2012. Holtse also explained that the North Broward Hospital District received federal funds through the Medicare program and that Broward County received CDBG funding from the federal government, as well as federal funding for projects related to the airport and the port.  The City also received CDBG funding, according to Holtse.

When viewed in the light most favorable to the government, the record establishes that the City received federal funds and that the City transferred, in one form or another, federal funds to the MCRA during fiscal years 2012 and 2013. The record also establishes, albeit with less specificity, that at some unidentified date in either 2012 or 2013 Broward County provided six bus shelters to the MCRA and that the MCRA agreed to maintain them.  Despite the deferential standard of review, the government's evidence failed to establish a connection to

32

any identifiable federal program so that its "structure, operation, and purpose" could be reviewed to permit a determination that the funds qualified as a federal benefit under the jurisdictional element of § 666(b). The evidence in the record that the MCRA received federal benefits was twofold: 1) the City received federal funds and the City in turn provided funding to the MCRA; and 2) Broward County used federal stimulus funds to construct six bus shelters, which were placed in the continued care of the MCRA.[4] Both *Fischer* and *Edgar* explain such a minimal showing is insufficient to sustain a conviction under the statute. *Fischer*, 529 U.S. at 681; *Edgar*, 304 F.3d at 1325. The government failed to prove beyond a reasonable doubt that the MCRA "receive[d] (1) more than $10,000 in federal funds (2) in connection with programs defined by a sufficiently comprehensive 'structure, operation, and purpose' to merit characterization of the funds as benefits under § 666(b)." *Edgar*, 304 F.3d at 1327.

In this case, the government presented insufficient evidence of a relationship between whatever federal program authorized the distribution of funds to Broward County and their ultimate use for bus shelters that were transferred to the MCRA. Here, there was no evidence as to the "structure, operation, and purpose" of the federal program that expended money to Broward County.

---

[4] During oral argument, the government conceded the record was "a little lax in this area" and that the only discussion in the record about the federal funds is that they were "stimulus funds."

33

It must be emphasized that it was the government's failure to produce evidence on this element that leaves us with no opportunity to examine the federal program's "structure, operation, and purpose."  Indeed, absent from the government's proof was any evidence identifying the relationship between the program authorizing a disbursement of federal funds and the ultimate use of those funds at the local level.  As was suggested in *Edgar*, indirect receipt of funds qualifies as a benefit only if the government can show a relationship between the "structure, operation, and purpose" of the federal scheme authorizing the distribution of funds and their ultimate use at the relevant local level.  *Edgar*, 304 F.3d at 1325.

Accordingly, there was insufficient evidence in the record from which a reasonable jury could find that the MCRA received a benefit of federal character. The evidence does not support the guilty verdicts for Counts II and III, and we find that the jury acted unreasonably in reaching such a verdict.  The jury did not choose among conclusions to be drawn from the evidence, because only one conclusion can be reached—there was insufficient evidence of federal benefits.

We recognize that evidence showing a confluence between the purpose and objectives of a federal program can support the inference that funding remains a federal benefit even though it has passed through multiple intermediaries before arriving at the defendant's agency.  Specifically, the First Circuit's opinion in

34

*Dubón-Otero* and the Fifth Circuit's opinion in *Jackson*, 313 F.3d 231, demonstrate that—while the onus is on the government to produce evidence of some connection between the authorization and ultimate use—it need not show that the federal government specifically authorized the local use. In this case, however, the government presented no evidence about the nature, structure, and purpose of the federal program that originally authorized the funds. The only evidence in the record is Holtse's general characterization of the funds as a "stimulus package" or "federal stimulus program." "Stimulus program" is not a federal program or grant that we can analyze to determine whether the funds Broward County used to purchase the bus shelters were benefits under *Fisher* and *Edgar*.[5]

---

[5] At least two Courts of Appeals have held that "testimony not corroborated by documentary evidence" can be sufficient to establish that a government or government agency received federal benefits exceeding $ 10,000 in a particular year, at least when the testimonial evidence is "unchallenged." *United States v. Brown*, 727 F.3d 329, 336-37 (5th Cir. 2013); *see also United States v. Robinson*, 663 F.3d 265, 269-70 (7th Cir. 2011) (holding that, where defendant was convicted of offering a bribe to a Chicago police officer under § 666, record evidence that the police department "received a law-enforcement grant from the [DOJ] in the amount of $6.2 million" was sufficient, and "if more were needed" it was established by "a DOJ document [in the record] explaining [w]hat the grant money would be used for").

Those cases are distinguishable from this case. First, Holtse's testimony was not "unchallenged." To the contrary, McLean's counsel vigorously argued throughout trial that none of the witnesses could establish that MCRA was a recipient of federal funds, and indeed elicited on cross-examination that Holtse was unsure about the amount of federal funds that had been used to pay for the State Road project and possibly the bus shelters. Additionally, the government entities in *Brown* and *Robinson* received direct federal funding, not indirect benefits. Based on our reading of *Fischer*, and as we suggested in *Edgar*, indirect receipt of funds qualifies as a benefit only if the government can show a relationship between the federal scheme authorizing the distribution of funds and their ultimate use at the relevant local level.

It should be emphasized that there is no evidence as to the actual amount of funds used by Broward County that were federal funds.  Holtse testified federal stimulus funds were used, but never identified an amount.  This is much too large of an inference to conclude that 1) federal stimulus funds were used; 2) each bus shelter costs $40,000; 3) there were six shelters built; and 4) that at least $10,000 in federal funds must have been used.

## B. Question of Law or Fact

We note that the government appears to raise the issue of whether the decision to classify assistance as a federal benefit is a question of law or fact.  To the extent the government now argues that the question of whether an item can be classified as a "benefit" under § 666 is a question of law and not of fact for the jury's determination—we need not address the alleged error because it was invited by the government.  The invited error doctrine "'is implicated when a party induces or invites the district court into making an error.'" *United States v. Love*, 449 F.3d 1154, 1157 (11th Cir. 2006) (quoting *United States v. Stone*, 139 F.3d 822, 838 (11th Cir.1998)).  "'Where invited error exists, it precludes a court from invoking the plain error rule and reversing.'" *Id.* (quoting *United States v. Silvestri*, 409 F.3d 1311, 1327 (11th Cir. 2005)).

Here, the government induced the district court into committing the error for which it now complains.  The government's proposed jury instruction explained

that six elements had to be established in order for McLean to be convicted of "Bribery Concerning Program Receiving Federal Funds."  The third element was, "[t]hat, during such one year periods, with respect to Count One, the City of Margate, Florida, received benefits in excess of $10,000 under a Federal program involving some form of Federal assistance."

During the charge conference, McLean objected to the absence of the language in the third element concerning the MCRA and its receipt of federal benefits.  After discussion with the parties, the district court explained:

> All right.  So, the Government is suggesting a modification with respect to  element three which would read that during such one-year periods, with respect to Count 1, the City of Margate, Florida received benefits in excess of $10,000 under a federal program involving some form of federal assistance; and that during the one-year period, with respect to Counts 2 and 3, the Margate Community Redevelopment Agency received benefits in excess of $10,000 under a federal program involving some form of federal assistance.

The Court then provided that language to the jury in the court's instructions.

Furthermore, at the hearing on McLean's Motion for Judgment of Acquittal, the government urged the District Court not to disturb the jury's factual determination. Accordingly, there is no need for us to wade into this issue because the District Court followed the government's urging in instructing the jury.

Even assuming, *arguendo*, that we were to address this issue we find no error.   The Supreme Court "has previously noted the vexing nature of the distinction between questions of fact and questions of law."  *Pullman-Standard v.*

37

*Swint*, 456 U.S. 273, 288 (1982). A question is typically one of fact when its resolution "will vary with the facts of each case." *Martin v. Occupational Safety & Health Review Comm'n*, 947 F.2d 1483, 1485 (11th Cir. 1991).  By contrast, a question of law is resolved "through an exercise in statutory interpretation" that "consider[s] the nature of the defendant['s] position[] in relation to Congress's intent, as evidenced by the legislative history of the federal" statute at issue. *United States v. Madeoy*, 912 F.2d 1486, 1494 (D.C. Cir. 1990).  Whereas, a mixed question of law and fact arises when "'[T]he historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the [relevant] statutory [or constitutional] standard, or to put it another way, whether the rule of law as applied to the established facts is or is not violated.'" *Ornelas v. United States*, 517 U.S. 690, 696-97 (1996) (alterations in original) (quoting *Swint*, 456 U.S. 273, 289 n.19).

Most helpfully, this Court has held in a variety of contexts that, when a jurisdictional issue is inextricably entwined with a substantive element of a crime, the issue should be determined at trial by a jury.  For example, in *United States v. Ayarza-Garcia*, 819 F.2d 1043 (11th Cir. 1987), we considered a criminal statute providing, in relevant part, "[i]t is unlawful for any person on board . . .  a vessel subject to the jurisdiction of the United States on the high seas, . . .  to possess with intent to . . .  distribute a controlled substance," *id.* at 1046 (alterations in original),

superseded by statute as recognized in *United States v. Tinoco*, 304 F.3d 1088, 1104-06 (11th Cir. 2002).   The Court rejected the defendants' argument that whether a vessel was "subject to the jurisdiction of the United States on the high seas" was a question of law.  *Ayarza-Garcia*, 819 F.2d at 1048.   It explained, "[W]hen a question of federal subject matter jurisdiction is intermeshed with questions going to the merits, the issue should be determined at trial.   This is clearly the case when the jurisdictional requirement is also a substantive element of the offense charged."  *Id.* (internal citations omitted).  Accordingly, the Court held that

> because Appellants' jurisdictional challenge was a challenge to the sufficiency of the government's evidence which would have involved determination of issues of fact going to the merits of the case . . . The proper procedure for raising Appellants' challenge to the sufficiency of the government's evidence to support a finding of assimilation to statelessness was by a motion for judgment of acquittal under Rule 29 and not by a pretrial motion to dismiss.  Upon denial of Appellants' Rule 29 motions, the question was one for determination by the jury.

*Id.* at 1048-49.

Similarly, in *United States v. Castleberry*, 116 F.3d 1384, 1389 (11th Cir. 1997), we held that whether a defendant's robbery had an effect on interstate commerce was a question for the jury because it is a substantive element of the offense.  In other words, that the element also represents the federal question that enables the court to exercise jurisdiction does not transform the question into a question of law.  And before that, the Fifth Circuit held that to sustain a conviction

39

for bribery under the Travel Act, the jury was required to determine "that the defendants, in fact, used interstate facilities." *United States v. Perrin*, 580 F.2d 730, 737 (5th Cir. 1978), *aff'd*, 444 U.S. 37 (1979).[6]

One published case from the Fifth Circuit does state that the $10,000 requirement is not a purely jurisdictional question and is properly submitted to the jury. *Jackson*, 313 F.3d at 233 ("The indictment sufficiently invoked the district court's jurisdiction, alleging violations of 18 U.S.C. § 666, including the allegation that the City of Monroe received federal funds in excess of $10,000 for each calendar year at issue. The district court had jurisdiction over the case because a violation of federal law was charged, regardless of the sufficiency of the Government's proof." (internal citation omitted)).

The government cites *United States v. Briston*, 192 F. App'x 84 (3d Cir. 2006), an unpublished Third Circuit case, in support of this proposition. In *Briston*, the Third Circuit considered whether the district court had improperly instructed a jury that particular funds were federal benefits, and reasoned that whether something constitutes a benefit is a question of law:

> The determination of whether funds provided under a specific federal program constitute "benefits" for the purpose of 18 U.S.C. § 666(b) neither requires nor allows a case-by-case factual inquiry by a jury. It is clear from our discussion above, and the Court's analysis in *Fischer*, that this is a statutory inquiry that requires a court to decipher

---

[6] This Court has adopted as binding precedent the decisions of the Fifth Circuit rendered prior to October 1, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

congressional intent by analyzing the "program's structure, operation, and purpose." This is plainly a question of law, not an issue of fact for the jury.

*Id.* at 88 (quoting *Fischer*, 529 U.S. at 681) (internal citation omitted).

Additionally, two published cases from other circuits have treated the determination that a particular transaction conferred a "benefit" within the meaning of § 666 as a question of law. *Dubón-Otero*, 292 F.3d at 6 ("We also review de novo the question of what type of transactions constitute benefits under § 666."); *United States v. Peery*, 977 F.2d 1230, 1233 n.2 (8th Cir. 1992) ("The district court . . . rul[ed] that the classification of the Compact Commission's rebate [as a benefit] is a matter of law for judicial determination. As our handling of section 666 implies, we agree that determining whether section 666 applies to [the defendant's] conduct is a question of law.").

However, based on our circuit precedent, if we were to address this issue, we would determine that the decision to classify assistance as a federal benefit was properly submitted to the jury.

## C. McLean's Motion to Strike

McLean cross-appealed the District Court's Order denying his Motion to Strike the government's untimely response to his Renewed Motion for Judgment of Acquittal and Motion for a New Trial. It is McLean's position that the government

violated the district court's local rules when it filed its response one week late, and that the district court should have granted his motions by default.

Southern District of Florida Rule 7.l(c) provides: "Each party opposing a motion shall serve an opposing memorandum of law no later than fourteen (14) days after service of the motion.  Failure to do so may be deemed sufficient cause for granting the motion by default."  Notably, the rule does not require the court to strike an untimely memorandum.  The district court, consequently, did not violate Rule 7.1(c) in considering the government's opposition to his motion.

Furthermore, this Court will not typically "second-guess the district court's interpretation of its own Rule" regarding timeliness in an effort to avoid "undermin[ing] the goal of [those] standards that local rules seek to establish." *Clark v. Hous. Auth. of City of Alma*, 971 F.2d 723, 727-28 (11th Cir. 1992).  Here, McLean provides no reasons to support his contention that the district court abused its considerable discretion in denying his motion to strike the government's response.  Moreover, as the government pointed out at the hearing on the motion, the district court was not constrained by Local Rule 7.1(c) from hearing live argument on the same issues presented in the government's brief.  Thus, striking the brief would not have automatically entitled McLean to judgment in his favor or resulted in the exclusion of the government's arguments.  In the end, the district

court was well within its discretion to consider the document in order to make a fully informed decision on the merits of McLean's sufficiency challenge.

## VI. CONCLUSION

Based on our review of the record, we affirm the district court's grant of judgment of acquittal.

**AFFIRMED**.