[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-10927
_____

D.C. Docket No. 4:15-cr-00010-RH-CAS-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JAMES S. DORAN,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Florida
_____

(April 26, 2017)

Before WILSON and JILL PRYOR, Circuit Judges, and BARTLE,[*] District Judge.

BARTLE, District Judge:

_____

[*]Honorable Harvey Bartle III, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

This is the appeal of Dr. James S. Doran who was convicted under 18 U.S.C. § 666 of embezzlement from Florida State University ("FSU"), an organization receiving federal funds.[1]  He argues that he is entitled to a judgment of acquittal. Doran maintains, among other grounds, that any embezzlement was not from FSU and that the Government did not prove that the victimized organization under the statute was a recipient of federal benefits.  The Court has jurisdiction of this appeal pursuant to 28 U.S.C. § 1291.  The Court's review of the District Court's denial of a judgment of acquittal is de novo.  See United States v. Yates, 438 F.3d 1307, 1311–12 (11th Cir. 2006) (en banc).

Section 666 provides in relevant part:

(a)  Whoever, if the circumstances described in subsection (b) of this section exists --

> (1)  being an agent of an organization, or of a State, local, or Indian tribal government, or any agency thereof --

> > (A)  embezzles, steals, obtains by fraud, or otherwise without authority knowingly converts to the use of any person other than the rightful owner or intentionally misapplies, property that --

> > > (i)  is valued at $5,000 or more, and

---

1. The District Court sentenced Doran to thirteen months in prison and fined him $15,000.  He was granted release pending appeal.

1

(ii)  is owned by, or is under the care, custody, or control of such organization, government, or agency;

. . .

shall be fined under this title, imprisoned not more than 10 years, or both.

(b)  The circumstance referred to in subsection (a) of this section is that the organization, government, or agency receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance.

(c)  This section does not apply to bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business.

See § 666.

We turn to the facts related to the embezzlement which we view in the light most favorable to the Government, the verdict winner.  See United States v. McLean, 802 F.3d 1228, 1233 (11th Cir. 2015).  Doran was a professor in the College of Business of FSU.  He was also a director and officer of the Student Investment Fund ("SIF"), a non-profit corporation established by FSU for charitable and educational purposes, and had signatory authority over the SIF's bank account.[2]

---

2.  The full name of the SIF, as stated in its Articles of Incorporation, is "The Florida State University College of Business Student Investment Fund, Incorporated."

In 2010, Doran transferred $300,000 of the SIF funds to his own personal account. In anticipation of an audit of the SIF, he returned the money a few months later. In 2011, he again moved money, this time $350,000, from the SIF to his personal account. After the SIF board members discovered this transfer, he repaid the amount in full. In 2010, he had also written a SIF check for $10,000 to cover an audit of his personal account. Only as a result of an investigation and after he was confronted in 2012 did he repay the $10,000 to the SIF.[3]

The SIF was established by FSU under Florida law in 2009. The objective of the SIF, as characterized in a FSU College of Business document, was to "enrich student education through active participation in financial markets. Students assist in stock selection and management of a real portfolio." The SIF began with approximately $300,000 donated by private sources. The FSU Foundation later added $1,000,000. The Foundation's funds came from private donors and not from FSU.

The SIF's Board of Directors consisted of seven directors. They included the Chair of the FSU Board of Trustees, the FSU President, and the FSU Vice President for Finance and Administration or their designees, as well as the Dean of the FSU College of Business, two FSU College of Business faculty members, and a member selected by the FSU President "with significant and substantial

---

3. Doran also paid the SIF $893.50 in interest.

3

investment experience and expertise." The SIF maintained its own bank account, filed its own tax forms, and paid for its own audits. It funneled no money to FSU, and FSU funneled no money to it. Under its Articles of Incorporation, the SIF had no power "to convey, lease, pledge, or otherwise encumber assets of the State of Florida" and "The Florida State University Board of Trustees and The Florida State University assume[d] no financial liability for the [SIF]."

Although the evidence established that Doran had embezzled funds from the SIF, the indictment made no mention of the SIF. Rather, the indictment's one count charged that Doran had embezzled or stolen property of FSU, which it described as the recipient of federal benefits.

Doran argues that his conviction must be overturned because the SIF was the victimized organization under § 666 but received no federal benefits. In Doran's view, the SIF and FSU are separate entities. The Government concedes the point that the SIF was not the recipient of any federal funds. Nonetheless it counters that the embezzlement by Doran comes within the ambit of § 666 because the SIF was closely affiliated with FSU which did receive millions of federal dollars and that Doran, an FSU professor, was acting as an agent of FSU when he committed the crime in issue.

To sustain a conviction under § 666, the Government must prove among other elements that the organization which was victimized received federal benefits

4

in excess of $10,000.  The relevant organization under the statute is the SIF since it was the organization that was the subject of the embezzlement.  The Government is mistaken in focusing on FSU as the victimized organization and in conflating FSU and the SIF.  Despite the affiliation of FSU and the SIF, there is simply no evidence in the record that FSU and the SIF are alter egos so as to allow the Court to pierce the SIF's corporate veil and to treat FSU and the SIF as one and the same.  See Molinos Valle Del Cibao v. Lama, C. por A., 633 F.3d 1330, 1349–51 (11th Cir. 2011); Dania Jai-Alai Palace, Inc. v. Sykes, 450 So. 2d 1114, 1116 (Fla. 1984).

This Court's decision in McLean is dispositive.  There, the defendant, David McLean, was charged under § 666 with accepting bribes in return for helping to obtain for the provider of the bribe a construction grant from the Margate Community Redevelopment Agency ("MCRA").  See McLean, 802 F.3d at 1231. McLean was a commissioner for the City of Margate as well as a board member of the MCRA.  The members of the City Commission and the MCRA Board were the same.  While the MCRA was a separate legal entity, "the City was financially accountable for the MCRA and the MCRA is part of the government's operations." See id. at 1241.

The City received federal funds directly from the federal government, but the MCRA did not.  The City, however, transferred some of its federal funds to the

5

MCRA.  For an organization such as the MCRA to be deemed the recipient of federal benefits under § 666, the Government must prove that the federal program had "a sufficiently comprehensive 'structure, operation, and purpose'" and a relationship with "the ultimate use of [the program's] funds at the local level."  See id. at 1243–44 (quoting United States v. Edgar, 304 F.3d 1320, 1325 (11th Cir. 2002)); Fischer v. United States, 529 U.S. 667, 681, 120 S. Ct. 1780, 1788 (2000).  This Court affirmed the District Court's entry of a judgment of acquittal on the ground that there was insufficient evidence that the MCRA had received a federal benefit as defined in Fischer and Edgar.  See McLean, 802 F.3d at 1244.

McLean identified the MCRA as the relevant local organization under § 666 and not the City.  It was the MCRA and not the City which was connected to the bribe at issue.  Likewise, here it was the SIF and not FSU that was the target of the embezzlement.  In McLean, where the governing board of the City and the MCRA were the same, the City and the MCRA had an even closer relationship than had FSU and the SIF.  Yet, this Court did not conflate the City and the MCRA.  The two affiliated entities in McLean were not alter egos and the two affiliated entities here were not alter egos.  Moreover, the Court in McLean did not consider significant in its analysis the federal funds retained by the City for its own use.  While in McLean the MCRA received some federal funds indirectly, the SIF, it must be emphasized, received no federal funding, directly or indirectly.  Thus,

6

there were no federal funds "owned by, or [ ] under the care, custody, or control of" the SIF.  See § 666(a)(1)(A)(ii).

The Government also argues that Doran's conviction should be upheld because he was an agent of FSU.  This argument fails.  Again, we reference McLean.  In that case, this Court did not deem defendant McLean's role as one of the City's commissioners to be relevant under § 666.  With respect to charges under § 666, McLean was simply acting as an agent of the MCRA even though City funds had been transferred to the MCRA.  In this case, Doran was a director and officer and thus an agent of the SIF.  His employment as a professor at FSU was irrelevant inasmuch as he did not embezzle any FSU funds.  Thus, any agency relationship he had with FSU is of no moment.

We acknowledge that § 666 is "expansive."  See Fischer, 529 U.S. at 678. Yet, its net cannot be cast so widely as to encompass the wrongdoing that occurred here, for the Government has not demonstrated any federal interest.  The Supreme Court cautioned that not "all recipient fraud" is covered under § 666.  See id. at 681.  As it explained, the meaning of the term "benefits" in the statute should not be interpreted as "limitless."  See id.  "Doing so would turn almost every act of fraud or bribery into a federal offense, upsetting the proper federal balance."  Id.

Doran has raised a number of additional grounds for reversal.  For example, he questions whether the Government has proven that the federal funds FSU

7

received were part of any program with a sufficiently comprehensive structure, operation, or purpose to meet the requirement under § 666(b) as a federal benefit. See id. In light of our above analysis, we need not reach this or any other issue.

In sum, the Government has not proven that the relevant local organization, the SIF, received any federal benefits. See § 666(b). As a result, Doran's conviction under § 666 cannot stand.

We reverse the judgment of conviction and direct the District Court to enter a judgment of acquittal.

**REVERSED AND REMANDED.**

JILL PRYOR, Circuit Judge, concurring in the judgment:

I agree with my colleagues that Doran's conviction cannot stand. I reach that conclusion by a different route, however. In a prosecution under 18 U.S.C. § 666, the government must, in addition to proving the criminal conduct (embezzling, stealing, obtaining by fraud, or converting property), identify the relevant organization to which the statute refers and prove that it received over $10,000 in qualifying federal benefits "in any one year period."[1] 18 U.S.C. § 666(b). As I read § 666, the relevant organization here is Florida State University ("FSU"), the organization that employed Doran, not the Student Investment Fund (the "SIF"), the student organization he advised that was the victim of his embezzlement. As such, the government needed to prove beyond a reasonable doubt that FSU—not the SIF—received over $10,000 in qualifying federal benefits during the relevant period. The government failed, however, to introduce evidence on this point sufficient to support a jury verdict. Accordingly, I agree with the majority that we must vacate Doran's conviction.

## I.    The Meaning of 18 U.S.C. § 666

Doran argues, and the majority agrees, that the government needed to prove that the SIF, as the victim organization, received over $10,000 in qualifying federal

---

[1] The statute defines this term to mean "a continuous period that commences no earlier than twelve months before the commission of the offense or that ends no later than twelve months after the commission of the offense." 18 U.S.C. § 666(d)(5). "Such period may include time both before and after the commission of the offense." *Id.*

9

benefits during the relevant period.  In my view, however, 18 U.S.C. § 666 imposes no such requirement.  Instead, it requires that FSU, the organization Doran served as an agent (as opposed to the SIF), received such benefits.

My analysis of § 666's meaning begins with its text.  *See Bodine v. Cook's Pest Control Inc.*, 830 F.3d 1320, 1329 (11th Cir. 2016) ("'Our inquiry begins with the statutory text, and ends there as well if the text is unambiguous'" (alteration omitted) (quoting *BedRoc Ltd. v. United States*, 541 U.S. 176, 183 (2004) (plurality opinion))).  The statute provides, in relevant part:

> (a) Whoever, if the circumstance described in subsection (b) of this section exists—
>
>> (1) being an agent of an organization . . . —
>>
>>> (A) embezzles, steals, obtains by fraud, or otherwise without authority knowingly converts to the use of any person other than the rightful owner or intentionally misapplies, property that—
>>>
>>>> (i) is valued at $5,000 or more, and
>>>>
>>>> (ii) is owned by, or is under the care, custody, or control of such organization . . .
>
> shall be fined under this title, imprisoned not more than 10 years, or both.
>
> (b) The circumstance referred to in subsection (a) of this section is that the organization, government, or agency receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance.

10

18 U.S.C. § 666(a), (b).  The statute defines an "agent" as "a person authorized to act on behalf of another person or a government and, in the case of an organization . . . includes a[n] . . . employee."  *Id.* § 666(d)(1).

Under § 666's plain language, to secure Doran's conviction the government needed to prove beyond a reasonable doubt that he was "an agent of an organization" and that he (in this case) "embezzle[d] . . . property that . . . [wa]s under the care, custody, or control of *such* organization," *id.* § 666(a)(1)(A)(ii) (emphasis added); that is, the organization of which Doran was an agent.  Section 666 further required the government to prove that "*the* organization . . . receive[d] . . . benefits in excess of $10,000 under a Federal program."  *Id.* § 666(b) (emphasis added).  Although the property that Doran was charged with embezzling was required to be "under the care, custody, or control of" the organization that employed him, *id.*, nothing in the statute required the government to prove that the victim of Doran's embezzlement received any federal benefits at all.  Because the text of § 666 is unambiguous, we need not go further to interpret the statute.

In the paradigmatic prosecution under § 666, in which a defendant is charged with embezzling, stealing, obtaining by fraud, or converting his employer's[2] property, the conceptual distinction between the defendant's victim

---

[2] I use employment terminology here as a shorthand for the various agency relationships § 666 reaches.  *See* 18 U.S.C. § 666(d)(1) ("[T]he term 'agent' means a person authorized to act

11

and the organization he serves as an agent would be of no moment. Suppose, for example, that a doctor embezzles money from her employer, a hospital that receives federal benefits. In this example, the hospital is both the doctor's employer and her victim. And so it likely is in most prosecutions under § 666.

But what if a defendant who works for Organization A steals funds owned by another organization, Organization B? By permitting the government to charge a violation where the ill-gotten property either "is owned by, *or* is under the care, custody, or control" of the defendant's employer, § 666 contemplates that the employer may not always be the property's ultimate owner. *Id.* § 666(a)(1)(A)(ii) (emphasis added). In this admittedly unusual scenario, to secure a conviction the government would need to prove that Organization A, not Organization B, received the requisite amount of federal benefits. That is because "the organization" that § 666 requires to have "receive[d] . . . benefits in excess of $10,000 under a Federal program" is the organization that the defendant served as "an agent." *Id.* § 666(a)(1), (b).

This is not to say that the defendant's victim may lack any connection to the federal benefits whatsoever—the government must still prove that the ill-gotten property of the victim was in the employer organization's "care, custody, or

on behalf of another person or a government and, in the case of an organization or government, includes a servant or employee, and a partner, director, officer, manager, and representative.").

12

control." *Id.* § 666(a)(1)(A)(ii). Although this Court has not previously construed § 666's "care, custody, or control" element, the term plainly requires that the employer organization had responsibility for or control over the embezzled property, though not that it owned the property itself.[3] Thus, although § 666 does not require the victim itself to have received federal benefits, it does require at a minimum that the victim's property be in the "care, custody, or control" of an organization that received over $10,000 in such benefits during the relevant period in order for the defendant's conduct to constitute a federal offense. *Id.* This requirement limits § 666's application "to conduct bearing a sufficient connection to the expenditure of federal funds or the integrity of federal programs." *United States v. Edgar*, 304 F.3d 1320, 1325 (11th Cir. 2002).

Once it has identified the organization that the defendant served as an agent, what must the government show to prove that the organization "receive[d], in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance"? 18 U.S.C. § 666(b). In *Edgar*, we construed this provision to require proof that the federal programs that disbursed funds to the predicate organization are "defined by a sufficiently comprehensive 'structure, operation, and purpose' to

---

[3] *See, e.g.*, Model Crim. Jury Instr. for the 3d Cir. No. 6.18.666A1A-4 ("[T]he words 'care,' 'custody,' and 'control'. . . express a similar idea. That is that the organization . . . had control over and responsibility for the property even though it was not the actual owner of the property at the time of [the defendant]'s actions." (alterations omitted)).

13

merit characterization of the funds as benefits under § 666(b)."  304 F.3d at 1327

(quoting *Fischer v. United States*, 529 U.S. 667, 681 (2000)).  "The inquiry should

examine the conditions under which the organization receives the federal

payments."  *Fischer*, 529 U.S. at 681.  We elaborated on this construction of

§ 666(b) in *United States v. McLean*, holding that to sustain a § 666 conviction, the

government must "show a relationship between the structure, operation, and

purpose of the federal scheme authorizing the distribution of funds and their

ultimate use at the relevant local level."  802 F.3d 1228, 1244 (11th Cir. 2015)

(internal quotation marks omitted).

To summarize, § 666 requires the government to prove, in addition to the

defendant's underlying criminal conduct, that (1) the defendant served as an agent

of an organization (2) that had "care, custody, or control" of the property that the

defendant misappropriated, 18 U.S.C. § 666(a)(1)(A)(ii), and (3) that received,

during a one year period, over $10,000 in federal funds that were disbursed

through programs whose "structure, operation, and purpose" are sufficiently

cohesive to warrant the funds' characterization as "benefits."  *Edgar*, 304 F.3d at

1327 (internal quotation marks omitted).

## II.    Doran's Challenge to the Sufficiency of the Evidence

Although the majority arrives at the correct outcome in this case, I would

reach it differently.  Applying § 666, as I read it, to the facts of this case, I would

14

reverse Doran's conviction on the sole ground that the evidence at trial was insufficient to prove to a reasonable jury beyond a reasonable doubt that FSU received the requisite amount of federal benefits during the relevant period under 18 U.S.C. § 666(b).  *See United States v. Pineiro*, 389 F.3d 1359, 1367 (11th Cir. 2004).  The government's evidence on this issue simply does not satisfy *Edgar*'s robust standard.

## A.    Element (1): Proof that Doran was an Agent of FSU

To secure Doran's conviction under § 666, the government needed to identify the relevant organization that Doran served as an agent.  Here, that organization is FSU—Doran was indicted and convicted as an "an agent of Florida State University" (Docs. 1 at 1; 49; 50).[4]  It is undisputed that Doran was "an agent of" FSU at the time he embezzled the SIF's funds.  18 U.S.C. § 666(a)(1).

Citing *McLean*, Doran argues that the SIF, not FSU, is the relevant organization for purposes of our § 666 analysis, because the funds he embezzled from the SIF neither belonged to nor flowed from FSU.  In my view, *McLean* does not support his argument.

McLean served simultaneously as a Commissioner for the City of Margate, Florida and on the board of the Margate Community Redevelopment Agency ("MCRA"), a municipal economic development agency.  *Id.* at 1232.  In the latter

---

[4] All references to "(Doc. __.)" refer to the numbered district court docket entries.

15

capacity, McLean solicited bribes from a local businessman with the promise of steering MCRA funds the businessman's way through a fraudulent construction grant application. *Id.* at 1232-33. The FBI uncovered the scheme, and McLean was indicted on two counts of bribery in programs receiving federal funds as "an agent of [the City of] Margate," in violation of § 666. *Id.* at 1231-32. The district court's jury instructions explained, however, that to convict McLean on those counts, the jury would need to find "that during the one-year period . . . the [*MCRA*] received benefits in excess of $10,000 under a federal program involving some form of federal assistance." *Id.* at 1245. The jury convicted McLean on both counts, *id.* at 1240, 1243, and by the time the case reached our Court, the government had conceded that the MCRA, not the City of Margate, was "the relevant local level" for our analysis of the federal benefits element. *See id.* at 1234, 1244 ("The government asserts that, viewing the evidence in the light most favorable to the government, the United States sufficiently established that the MCRA received federal benefits in excess of $10,000."). In doing so, the government effectively conceded that the MCRA was the relevant organization.

In reviewing McLean's convictions on appeal, we decided the only question the parties put to us, which was whether the evidence at trial sufficed to prove that the MCRA had received over $10,000 in funds from "programs defined by a sufficiently comprehensive structure, operation, and purpose to merit [their]

16

characterization . . . as benefits." *Id.* at 1231 (internal quotation marks omitted). In looking at the sufficiency of the evidence, we followed the parties in identifying the MCRA, rather than the City of Margate, as "the relevant local level" for conducting our § 666 analysis. *Id.* at 1244. But we never considered which organization—the MCRA or the City of Margate—was in fact the relevant organization for the purposes of our analysis, as the parties did not brief or argue that issue on appeal. *See Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 170 (2004) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." (internal quotation marks omitted)).

As such, I do not read *McLean* as requiring the government to prove that the SIF is the relevant organization for our § 666 analysis. To convict Doran, the government needed to prove that Doran was an agent of FSU and that FSU had "care, custody, or control" over the embezzled funds and received over $10,000 in federal benefits during the relevant period. 18 U.S.C. § 666(a)(1)(A)(ii), (b). Doran does not challenge the sufficiency of the government's proof of the first element. We discuss the other two elements below.

**B.    Element (2): Proof that FSU Had Care, Custody, or Control Over the Funds that Doran Embezzled**

Having correctly identified FSU as the relevant organization under § 666, the government was required to prove that FSU exercised "care, custody, or

17

control" over the funds that Doran embezzled.[5]  *Id.* § 666(a)(1)(A)(ii).  As I explained above, § 666 did not require the government to prove that FSU owned the embezzled funds.  By its plain terms, the statute allowed the government to prove that FSU either "owned . . . *or* . . . [had] care, custody, or control of" the funds that Doran embezzled.  18 U.S.C. § 666(a)(1)(A)(ii) (emphasis added).  The fact that it was the SIF's money Doran embezzled thus does not change this analysis.

The government proved that (1) FSU determined the composition of the SIF's Board of Directors, *see* SIF Articles of Incorporation ("SIF Articles") art. VII, §§ 1, 2; (2) FSU officers or employees held six of seven Board positions, *see id.*; (3) FSU's Board of Trustees and president each had veto power over changes to the SIF's Articles and bylaws, *see id.* art. IX; (4) Doran, an FSU employee, managed the SIF's funds on a day-to-day basis, executing trades, vetoing investment decisions he thought unwise, and moving funds in and out of the SIF's bank account; and (5) the SIF was a "University direct-support organization" under Florida law, *see* Fla. Stat. § 1004.28;[6] SIF Articles art. IV, § 1.  This evidence

---

[5] Doran urges us to adopt the definition of "care, custody, or control" used in the Third Circuit's Model Criminal Jury Instructions.  *See supra* note 3.  I accept that definition, which does not change the result here.

[6] A "University direct-support organization" is an organization that is

1.  A Florida corporation not for profit incorporated under the provisions of chapter 617 and approved by the Department of State.

18

sufficed to enable a "reasonable trier of fact, choosing among reasonable interpretations of the evidence, [to] find . . . beyond a reasonable doubt" that FSU had care, custody, or control over the funds that Doran embezzled.[7] *Pineiro*, 389 F.3d at 1367.

---

2. Organized and operated exclusively to receive, hold, invest, and administer property and to make expenditures to or for the benefit of a state university in Florida or for the benefit of a research and development park or research and development authority affiliated with a state university and organized under part V of chapter 159.

3. An organization that a state university board of trustees, after review, has certified to be operating in a manner consistent with the goals of the university and in the best interest of the state. Any organization that is denied certification by the board of trustees shall not use the name of the university that it serves.

Fla. Stat. § 1004.28(1)(a). "The chair of the university board of trustees may appoint a representative to the board of directors and the executive committee of any direct-support organization." *Id.* § 1004.28(3). In addition, "[t]he president of the university[,] . . . or his or her designee, shall also serve on the board of directors and the executive committee of any direct-support organization established to benefit that university." *Id.* Direct-support organizations must submit to annual audits by independent certified public accountants in accordance with rules adopted by the university board of trustees. *Id.* § 1004.28(5)(a). Audit reports must be submitted to the Board of Governors of the State University System of Florida for review. *Id.* "The Board of Governors [and] the university board of trustees . . . shall have the authority to require and receive from the organization or from its independent auditor any records relative to the operation of the organization." *Id.*

[7] Citing *Stiller v. Sumter Bank and Trust Co.*, 860 F. Supp. 835 (M.D. Ga. 1994), Doran argues that to prove § 666's "care, custody, or control" element, 18 U.S.C. § 666(a)(1)(A)(ii), the government needed to prove that his embezzlement exposed FSU to a risk of loss. *Stiller* involved a civil claim under the federal bank fraud statute, which prohibits the use of false or fraudulent means to obtain "property . . . under the custody or control of[] a financial institution," 18 U.S.C. § 1344(2); "[a]s long as [a] bank is exposed to the **risk of loss** by some scheme or artifice," *Stiller* said, "[§ 1344] has been violated." *Stiller*, 860 F. Supp. at 839. *Stiller* did not construe § 1344 to require proof that an organization bore the risk of loss for a defendant's conduct to establish the organization's custody or control over the misappropriated property; it held only that such proof suffices to satisfy the statute. For similar reasons, I do not read § 666 to require proof that FSU bore the risk of loss for Doran's embezzlement of the SIF's funds.

19

**C.    Element (3): Proof that FSU Received the Requisite Federal Benefits**

The government failed to meet its burden to prove that FSU received the requisite amount of federal benefits during the relevant period.  Viewing the evidence in the light most favorable to the government, I conclude that no reasonable jury could have found beyond a reasonable doubt that FSU received over $10,000 in federal funds "in connection with programs defined by a sufficiently comprehensive structure, operation, and purpose to merit characterization of the funds as benefits under § 666(b)."  *McLean*, 802 F.3d at 1231 (quotation marks omitted).

With respect to the federal benefits element of § 666, it was the government's burden to "prove beyond a reasonable doubt that [Doran] worked for an entity which received (1) more than $10,000 in federal funds (2) in connection with programs defined by a sufficiently comprehensive structure, operation, and purpose to merit characterization of the funds as benefits under § 666(b)." *McLean*, 802 F.3d at 1237 (alterations and internal quotation marks omitted).  To satisfy this test, the government must at a minimum identify (1) one or more particular disbursements of federal funds to the recipient organization during the relevant one year period; (2) the dollar amount of each disbursement, the sum of which must exceed $10,000; (3) the date each disbursement was made; and (4) a sufficiently particularized purpose for which each disbursement was made.

20

*McLean*, 802 F.3d at 1237.  We "scrutinize the actual evidence" the government presented as to whether federal funds rise to the level of "benefit."  *Id.* at 1231, 1240.  "To satisfy this scrutiny, a court should examine the conditions under which the organization receives the federal payments."  *Id.* at 1236 (internal quotation marks omitted).

The government's sole evidence as to the "structure, operation, and purpose," *id.* at 1237, of the federal programs that provided funding to FSU was the testimony of Pamela R. Ray, FSU's Director of Sponsored Research.  Ray described the federal programs that disbursed funds to FSU in broad and general terms that failed to provide the sort of detail that *McLean* requires.  She identified several disbursements of funds to FSU during the period in which Doran's conduct transpired and gave precise dollar amounts for some disbursements, dates of disbursement for others, and particularized purposes for others still, but for no disbursement did she identify all three.

For example, Ray testified that FSU received $179 million in federal funds during Fiscal Year 2010 and $165 million in federal funds during Fiscal Year 2011,[8] but she gave no dates and described no program or purpose for which the funds were disbursed.  She testified that FSU's National High Magnetic Field Lab at Innovation Park, its Learning System Institute, its Center for Disease Prevention

---

[8] Ray testified that the term "Fiscal Year X" refers to the period beginning on July 1 of the year prior to Year X and ending on June 30 of Year X.

21

at the College of Medicine, its Center for Advanced Power Systems, and unspecified departments in FSU's arts and sciences colleges received federal funding, but again provided no dates on which the funds were disbursed or dollar amounts that were received.  She described the purposes for this funding at a high level of generality:

> The federal government has utilized universities for many years to tap into the wealth of knowledge that a university has all the way from humanities through the hard sciences; and they benefit in that they are able to target specific experience that professors and faculty and staff at universities have.  And in most cases they get better value if they go to universities for this information to advance science or new discoveries, or whatever the federal government is interested in. . . .

> [Y]ou look at the federal programs that Florida State receives, the National Institute of Health, you know, they are designed—and this is technical, so it's something that I'm not really exactly experienced in, but—the technical side of the National Institute of Health is for disease control, for new drugs.  And then, for instance, the National Science Foundation, we get a lot of money from them to advance more of the psychology, the biological sciences, where they are looking at the new discoveries and new technologies to, in other words, help the common good for the public.

(Doc. 52 at 8.)  Ray also testified that FSU's College of Business received $40,000 from an unspecified federal agency on an unspecified date or dates in Fiscal Year 2011, but she identified no program or purpose for which the funds were disbursed. For no program did she provide any information about its structure or operation or any conditions under which the funds were received.

22

Such generalized descriptions cannot suffice to demonstrate the existence of a federal program "defined by a sufficiently comprehensive structure, operation, and purpose to merit characterization of [its] fund[ing] as benefits." *McLean*, 802 F.3d at 1237 (internal quotation marks omitted).   The government failed to elicit testimony from Ray or present any other evidence sufficient to establish that FSU received "benefits" within *McLean*'s meaning. *Id.* at 1240.  For this reason—and only this reason—I would reverse Doran's conviction under § 666.

### III.    The Constitutionality of § 666

Doran argues that construing § 666 to require the government to prove that FSU, rather than the SIF, received the requisite amount of federal benefits would render the statute unconstitutional.  "[I]t is a well-established principle governing the prudent exercise of [our] jurisdiction that normally th[is] Court will not decide a constitutional question if there is some other ground upon which to dispose of the case." *Bond v. United States*, 134 S. Ct. 2077, 2087 (2014) (internal quotation marks omitted).  Because the majority and I would reverse Doran's convictions on the ground that the government's evidence was insufficient for a reasonable jury to find each element of § 666 beyond a reasonable doubt, we need not and should not reach his constitutional challenge to the statute.

The majority opinion states, however, that § 666's "net cannot be cast so widely as to encompass the wrongdoing that occurred here, for the Government

23

has not demonstrated any federal interest." Maj. Op. at 7. Reading this statement

to mean only that § 666 does not reach Doran's conduct as a matter of statutory

interpretation, I take no issue with it, even though I disagree with the majority's

construction. Nevertheless, to the extent the statement could be read to suggest

that Congress's Article I power cannot constitutionally reach Doran's conduct, I

pause to make some brief observations. First, I suggest the better course would be

to refrain from addressing this question until it is necessary to the resolution of a

case before us.

Second, were we to evaluate the constitutionality of the statute, we would

apply the following standard: "[I]n determining whether" Congress has "the

legislative authority to enact a particular federal statute, we look to see whether the

statute constitutes a means that is rationally related to the implementation of a

constitutionally enumerated power." *United States v. Comstock*, 560 U.S. 126, 134

(2010). Congress's authority to enact § 666 flows from the Spending Clause. *See*

Article I, § 8, cl. 1; *Sabri v. United States*, 541 U.S. 600, 605 (2004). The majority

does not address the argument that § 666, applied to Doran's prosecution, is a valid

exercise of Congress's authority under the Spending Clause to ensure that taxpayer

dollars are not used to line thieves' pockets. Moreover, as the district court

observed, "[n]o prudent benefactor would knowingly provide funds to an

organization that employs a thief—regardless of whose funds the thief makes a

24

practice of stealing." (Doc. 85 at 21.) The majority also does not address the fact that FSU financially supported the SIF in the form of classroom space, a faculty advisor whose salary it paid,[9] and other non-monetary resources.

We should not raise doubts about § 666's constitutionality without considering these points. I do not mean to suggest that all or any of them are meritorious. To the contrary, I believe we should refrain from addressing— however off-handedly—the extent of Congress's authority to criminalize conduct such as Doran's. We have no duty to ask whether § 666—read more broadly than the majority construes it—would survive constitutional scrutiny because this case does not turn on the statute's constitutionality.

## IV.    Conclusion

For the reasons explained above, I concur in the majority's judgment that Doran's conviction must be reversed.

---

[9] The SIF did not pay Doran a salary; its bylaws provided that its officers "shall receive no special salary or compensation for being officers of this Corporation other than their usual salaries as employees of The Florida State University, if so employed." SIF Bylaws art. III, § 8.

25